[Civ. No. 18954.   Second Dist., Div. Three.   Oct. 16, 1952.]

ELAINE E. REVELS, Appellant, v. SOUTHERN CALI-
FORNIA EDISON COMPANY (a Corporation) et al.,
Defendants; R. V. MEAD et al., Respondents.

Kelley & Kelley, Frank W. Woodhead and Howard C. Velpmen for Appellant.

Hunter & Liljestrom and Wendell Mackay for Respondents.

VALLÉE, J.—Appeal by plaintiff from a judgment of nonsuit in an action for damages for the alleged wrongful death of her husband. The cause was tried on the issues made by the complaint and the answer of defendants R. V. Mead, E. S. O'Donnell, and Mead & O'Donnell, a partnership, referred to as defendants.

The evidence and the inferences that may be reasonably drawn therefrom are stated in the light most favorable to plaintiff.

On June 24, 1948, defendants had a contract with the city of Beverly Hills, in which they had agreed to construct a building. The contract provided that "said Contractor agrees at its own expense to furnish all materials, labor, tools and equipment necessary to construct, install and complete" the building, and "The Contractor will have a representative on the job at all times"; and "The said Contractor agrees to assume and accept all responsibility for any personal, property or other damage that may occur to any person or persons, or to the general public on account of the work to be done hereunder by said Contractor or on its behalf while transporting any of the materials or equipment to or from the location of said proposed work, or in handling the same. or in doing said work until such time as said work has been accepted by said City. . . ."

Defendants, in turn, had entered into a contract with Russell H. Roemisch by which he agreed to install the reinforcing steel in the building. The deceased Chase and one Turner were employed by Roemisch as structural steel workers. June 24, 1948, was the first day Chase and Turner worked on the job. They arrived about 7:45 a. m. When they arrived they talked to Moose, job superintendent for defendants. They asked Moose what he wanted done. Moose told them "where the reinforcing was and what was to be done, the location of the work that we were supposed to put in"; that the location was "up on the roof, on the corner . . . on the west end of the building." Moose at that time gave them a placing sheet which described where the reinforcing steel rods were to go, how many of them and the lengths to be used at a particular location. The two men did not talk to anyone other than

Moose about the work to be done. The steel rods were to be placed in a cornice on the top of the wall of the building. The cornice was a concrete part of the wall between the top layer of brick and the roof. Some of the rods were 30 feet long, others 15 feet, others 4 feet. The rods were threaded into stirrups in the locations shown on the placing sheet. Stirrups are metal rods bent into a square shape with a hook on the top extending away from the wall. Chase had to insert the rods into the tops of the stirrups. To do so, he had to lift them to an angle of at least 45 degrees and start them from the top. There was a piece of wood along the peak of the roof which obstructed the insertion of some of the reinforcing rods, so they had to be put in over the wooden beam at the peak.

There was a high voltage line which overhung the roof of the building. The line was suspended on crossarms, carried 66,000 volts of electricity, and was uninsulated. The lowest wire was 13 feet, 9 inches above the place where Chase was working at the time of the accident. Chase was 5 feet, 11 inches tall. He was close to the peak of the roof, handling a steel rod 15 feet in length which had to be tipped up at a sharp angle in order to insert it into the stirrup. Suddenly there was a dull roar; Turner looked up to see a flame covering Chase's body. The top of the rod which Chase was handling had contacted the high voltage wire which hung over the roof directly over the two men. The rod had grounded at the bottom end on a piece of steel which was sticking up through the roof. Chase died the next day.

Defendant Mead testified he knew prior to June 24, 1948, of the presence of the high voltage wires; he knew there was a clearance of about 12 feet between the top of the building and the nearest wire; he, his partner, and an employee had had numerous conversations with representatives of Southern California Edison Company, owner of the power line, prior to June 24, 1948, relative to moving the poles and the wires; the first conversation was about February, 1948. He testified that one reason for wanting the poles and wires moved was: "In our opinion they were too close to the building." Mead was on the job the morning of the accident. He testified he did not warn Chase or Turner of the existence of the high voltage wires, and did not advise Moose to warn Chase or Turner of the danger.

No one warned either Chase or Turner before the accident of the existence of the wire overhanging the roof or of the fact that it was uninsulated. There were no warning signs

on the roof. Turner testified he did not "see any other signs around to indicate that these were high-voltage wires"; Moose did not tell him there were any such wires above him, or that the wires were uninsulated; "nobody mentioned any wires"; he did not know they were high voltage wires; Chase did not mention anything to him about the wires. He further testified there were no barriers erected on the roof to prevent contact of the steel rods with the wires, and there were no rubber or insulated sleeves over the wires.

About a month after the accident, one of the poles holding the wires was moved, and the wires raised 5 feet.

The complaint alleged that defendants, with full knowledge of the fact that the wires were uninsulated and carried electrical voltage of over 750 volts, negligently directed and permitted Chase to perform work and carry materials within 6 feet of said wires without taking the proper precautions to prevent injury to him, and without warning him of the fact that the wires were uninsulated and carried high voltage.

The nonsuit was granted on the ground there was no proof of negligence. There is no question of contributory negligence or assumption of risk involved.

Plaintiff urges that defendants, as general contractors, were under a duty to provide Chase, an employee of a subcontractor, with a reasonably safe place to work; that the evidence was sufficient to warrant the jury in concluding that they negligently failed to do so, and that, therefore, the nonsuit should not have been granted. Defendants contend the contrary.

We use the term "general contractor" to indicate one who contracts directly with the owner to do the work; and the term "subcontractor" to indicate one who contracts with the general contractor to do part of the work.

An employee of a subcontractor doing work contracted to be done by the latter is an invitee of the general contractor, and the duty owed by the general contractor to such employee is the duty owed by one to invited persons. (*Fountain* v. *Willard-Slater Co.,* 172 Cal. 129, 131 [155 P. 630]; *Lucas* v. *Walker,* 22 Cal.App. 296, 299-300 [134 P. 374, 379].) The duty is to exercise ordinary care to keep the premises in a reasonably safe condition, or to warn of danger. The duty is not limited to conditions actually known to be dangerous, but extends also to conditions which might have been found dangerous by the exercise of reasonable care. (*Raber* v. *Tumin,* 36 Cal.2d 654, 658 [226 P.2d 574].) If there

are hidden dangers on the premises of which the invitor has knowledge, or which are discoverable by him in the exercise of ordinary care, he must use ordinary care to give warning thereof. (*Dobbie* v. *Pacific Gas & Electric Co.*, 95 Cal.App. 781, 788-790 [273 P. 630].)

The general rule is that a general contractor on a construction job who is in control of the premises is burdened with the duty to use ordinary care to provide a safe place for employees of a subcontractor to work, including the duty to warn such employees of a danger, either known to the general contractor, or discoverable by the exercise of ordinary care, or otherwise to protect the employees from injury, and to avoid exposing them to injury on account of dangerous conditions. He is bound to take reasonable measures to protect the employees of a subcontractor from injuries likely to arise from places of danger about the building. If he neglects this duty by failing to give adequate notice or warning of the existence of a place of danger, he may be found liable to an employee of a subcontractor for resulting injury. (*Dingman* v. *A. F. Mattock Co.*, 15 Cal.2d 622, 624 [104 P.2d 26]; *Brockman* v. *Aldous*, 11 Cal.App.2d 650 [54 P.2d 43]; *Caspersen* v. *La Sala Bros.*, 253 N.Y. 491 [171 N.E. 754]; Anno. 20 A.L.R. 2d 868, and cases there cited.)

As a part of supervising the work, it is the duty of the general contractor to oversee conditions in the work of each subcontractor so far as they affect the safety of the employees of the subcontractor. Although the oversight of the work of an employee of a subcontractor is properly the function of the subcontractor who employs him, if the general contractor's superintendent directs such employee in a particular matter, the superintendent may be found to have assumed control of the work of the subcontractor to that extent, and the general contractor may be held responsible for his resulting injury,—as where the superintendent of the contractor directs a carpenter to go on planks not properly supported by the superintendent's employer (*Broderick* v. *Cauldwell-Wingate Co.*, 301 N.Y. 182 [93 N.E.2d 629]), or sends an employee into a dangerous place and fails to warn him when danger develops (*Herndon* v. *Halliburton Oil Well Cementing Co.*, (Tex.Civ.App.) 154 S.W.2d 163), or tells a stevedore to load a derrick sling with bags of sugar from the side of the pile rather than from the top as he had been doing (*McGrath* v. *Pennsylvania Sugar Co.*, 282 Pa. 265 [127 A. 780, 782]). While a general contractor is not

under a duty to warn an employee of a subcontractor of obvious danger, the question whether the danger was obvious is a question for the jury. (*Dingman* v. *A. F. Mattock Co.*, 15 Cal.2d 622, 625 [104 P.2d 26]; 19 Cal.Jur. 585, § 27.)

If defendants had reasonable grounds to apprehend that Chase might come in contact with the electricity in pursuit of his work, reasonable care required that he be warned, or the wires guarded. (*Young* v. *Bates Valve Bag Corp.*, 52 Cal.App.2d 86, 94 [125 P.2d 840].)

We hold it was the duty of defendants, as general contractor, to exercise ordinary care to provide Chase, the employee of the subcontractor, with a reasonably safe place to work. (*Cf. Kiernan* v. *Herbert M. Baruch Corp.*, 20 Cal. App.2d 289 [66 P.2d 748].)

Cases cited by defendants are factually dissimilar, and need not be reviewed in detail. (*Hayden* v. *Paramount Productions, Inc.*, 33 Cal.App.2d 287, 289 [91 P.2d 231], [relation of contractor and subcontractor not present]; *Neuber* v. *Royal Realty Co.*, 86 Cal.App.2d 596 [195 P.2d 501], [warning would not have advised the plaintiff of anything she did not already know, and see *Finnegan* v. *Royal Realty Co.*, 35 Cal. 2d 409 [218 P.2d 17], in which on substantially the same evidence, a judgment for the plaintiff was upheld]; *Sweatman* v. *Los Angeles Gas & Elec. Corp.*, 101 Cal.App. 318 [281 P. 677], [action was against the power company, not the contractor]; *Benard* v. *Vorlander*, 87 Cal.App.2d 436 [197 P.2d 42], [the only question discussed was the liability of the power company—the liability of the contractor was not involved].)

When different inferences as to negligence may reasonably be drawn from the evidence, it is the duty of the court on a motion for nonsuit to submit the question to the jury.

Applying this rule to the evidence here, it is apparent that the questions whether defendants provided Chase with a reasonably safe place to work, and whether they were negligent, were for the jury. The jury might reasonably have concluded that: defendants were in control of the premises, and had complete supervision of all of the work; a dangerous condition existed on the roof of the building; defendants had knowledge of the dangerous condition; they knew the wires were "too close to the building"; it was necessary for Chase to perform his work on the roof in close proximity to the high voltage wires; defendants knew this fact; they knew the lowest wire was about 12 feet above the peak of the roof; as the

building contractors, they knew, or in the exercise of ordinary care should have known, that Chase, a man 5 feet, 11 inches tall, in installing the steel rods might be required to stand near the peak of the roof and tip the steel rods, 15 and 30 feet in length, to an angle of 45 degrees; defendants did not warn Chase of the presence of the wires, or that they were uninsulated, or that they carried high voltage; defendants failed to exercise ordinary care in not warning Chase of the danger, or in not erecting a barrier between the uninsulated wires carrying 66,000 volts and the roof of the building to prevent contact with the wires. The jury also might very reasonably have concluded that contact of the steel rod with the high voltage wire was the proximate consequence of defendant's failure to warn Chase of the fact that the wires carried high voltage and were uninsulated.

It cannot be said, as a matter of law, that the danger was obvious. Turner had worked with Chase on the premises and on the roof about three and three-quarters hours that morning. He did not know that the wires carried high voltage, or that they were uninsulated. Chase did not mention the wires to Turner. The jury might reasonably have concluded that Chase did not know anything more about the wires than did Turner. █ Further, the law presumes that Chase was exercising ordinary care for his own concern, since there is no uncontradicted testimony on the part of plaintiff which is wholly irreconcilable with the presumption. (*Scott* v. *Burke*, 39 Cal.2d 388, 394-395 [247 P.2d 313].)

█ █ After plaintiff rested, and before defendants made their motion for a judgment of nonsuit, the court and the jury, at the request of defendants, viewed the scene of the accident. The court stated that the view would not constitute a waiver of defendants' right to make the motion. Defendants, in support of the judgment of nonsuit, refer us to evidence taken at the view. Such evidence was not a part of plaintiff's case, and cannot be considered in reviewing the correctness of the judgment of nonsuit. Neither can we assume that the learned trial judge considered such evidence in ruling on the motion, as plaintiff intimates.

█ Plaintiff asserts that the court erred in refusing to admit evidence of custom and safe practice. A qualified expert was asked by plaintiff's counsel: "Q. Now, Mr. Short, do you have any knowledge concerning any custom as to reasonably good, safe practice in the construction industry when work is to be done in close proximity to high-voltage

lines?" He answered that he did. He was then asked: "What is that custom?" Defendants' objection was sustained. Plaintiff then made the following offer of proof: "I offer to prove that this witness, Frank A. Short, would testify in answer to my questions that the custom and good, safe practice in the construction industry, when work is to be done in close proximity to high-voltage wires, is for the person who is responsible for the work to do one of the following things: (1), Guard the wires by a mechanical barrier, to prevent physical contact; (2), Deenergize or ground the wires where necessary; (3), Move the poles or the wires. That said work is customarily done at the expense of the contractor or person responsible for the work." Defendants' objection to the offer was sustained. The offer was insufficient. It was that the work to be done pursuant to the custom was customarily done at the expense of the contractor, or person responsible for the work. It was not that it is done at the expense of the general contractor in a case where the work is to be done by a subcontractor. We do not decide whether evidence of custom is admissible where the work to be done pursuant to the custom is customarily done at the expense of the general contractor.

Other assigned errors are not likely to occur on a retrial, and need not be discussed.

We hold it was error to grant the motion for judgment of nonsuit.

Reversed.

Shinn, P. J., and Wood (Parker), J., concurred.