VALLÉE, J.
 

 Appeal by defendants 6505 Wilshire Bldg. Corporation and P. J. Walker Company from a judgment for plaintiffs in an action for wrongful death. The cause was tried by the court sitting without a jury.
 

 Defendant 6505 Wilshire Bldg. Corporation was the owner of property on Wilshire Boulevard in Los Angeles. Defendant P. J. Walker Company was the general contractor in the construction of a 12-story office building on the property pursuant to a contract between it and the owner. Robert J. Hiller Construction Company was a subcontractor engaged in installing concrete floors. Anthony C. Meehleis was a subcontractor engaged in installing reinforcing steel. The deceased, Severo Gonzales, was an employee of Meehleis. It was stipulated at the pretrial hearing that the general contractor and each of the subcontractors were independent contractors. The
 
 *526
 
 court found that no defendant was the agent of any other defendant.
 

 At the time in question the building was a framework of steel beams. Commencing at the ground floor to and including the sixth floor, concrete floors had been laid. The concrete floors were being laid in this manner: The steel I-beams which formed the framework of the building were enclosed in wooden forms, the sides of which had cleats to support 2- by 6-inch or 2- by 8-inch joists which stood edgeways on the cleats. Metal pans 12 inches wide, 5 feet long, with a 2-inch metal flange on each side, and weighing about 25 pounds, were placed flat on top of the joists. They were laid parallel to the edge of the building. Before the concrete was poured the pans were oiled to make them slippery so they would come down easily. When laid snugly, the pans made a form into which concrete was poured.
 

 The pans were stripped or removed a few days after the concrete had been poured. A movable wooden scaffold was used. It was about 6 feet high and 6 feet wide; its floor was about 6 feet below the ceiling. It did not have a solid floor, but was “about 50% covered.” It had no sideboards. In order to strip the pans, the joists were knocked on their sides and every other one was removed. This left a horizontal space between the flattened joists of about 20 inches and a vertical space of about 4 inches between the top of the joists to the bottom of the pans. The pans were then unsupported except by adhesion to the hardened concrete. A crowbar was used to loosen the pans and allow them to fall to the joists. It was not unusual for three or four pans to drop to the joists at one time. Ordinarily they dropped only the 4-inch distance to the joists, but several times a day a pan would go through the aperture between the joists and fall about 5 feet to the scaffold on which Hiller’s employees worked. One or two a day would go through the boards of the scaffold and fall about 12 feet to the concrete floor on which the scaffold rested.
 

 On April 23, 1956, the day of the accident, the deceased was working on the second floor level at an open bay near the outer edge of the building. He was replacing steel reinforcing rods in a wooden form for a window sill. The form was about waist-high. Outside the open bay was a scaffold which was part of the form for the exterior walls. There were four reinforced concrete slabs between the deceased and the sixth floor level. When stripping pans near the edges of the
 
 *527
 
 building, the scaffold on which the men worked was installed about 12 or 13 inches from the edge. Two employees of Hiller were on the scaffold stripping pans from the ceiling of the sixth floor. They were working at the middle bay on the west side of the building “right up” to the I-beam which formed the outside edge of the building. The scaffold “fit just about a bay.” There was nothing in the bay to prevent objects from falling over the side of the building, except a % or 1-inch rope. As they were stripping, three pans fell at one time. One of them, located about 24 inches from the west edge of the building, fell, “hit the scaffold and tumbled over” out of the bay, down the outside of the building, and apparently struck the scaffold outside the open bay, caromed into the second floor between the ceiling and floor striking Gonzales, and causing injuries from which he died.
 

 The owner and the general contractor each contends the evidence is insufficient to sustain the finding that it was negligent.
 

 The Case Against the Owner
 

 In
 
 McDonald
 
 v.
 
 Shell Oil Co.,
 
 44 Cal.2d 785 [285 P.2d 902], the court stated (p. 788) :
 

 “The general supervisory right to control the work so as to insure its satisfactory completion in accordance with the terms of the contract does not make the hirer of the independent contractor liable for the latter’s negligent acts in performing the details of the work.
 
 (Green
 
 v.
 
 Soule,
 
 145 Cal. 96, 99-100 [78 P. 337].) An owner is not liable for injuries resulting from defective appliances unless he has supplied them or has the privilege of selecting them or the materials out of which they are made
 
 {Hard
 
 v.
 
 Hollywood Turf Club,
 
 112 Cal.App.2d 263, 274-275 [246 P.2d 716]) or unless he exercises active control over the men employed or the operations of the equipment used by the independent contractor.
 
 {Willis
 
 v.
 
 San Bernardino Lbr. & Box Co.,
 
 82 Cal.App. 751, 756 [256 P. 224].)” (Also see
 
 Williams
 
 v.
 
 Fairhaven Cemetery Assn.,
 
 52 Cal.2d 135, 139-140 [338 P.2d 392];
 
 Sabin
 
 v.
 
 Union Oil Co.,
 
 150 Cal.App.2d 606, 608 [310 P.2d 685].)
 

 The record is devoid of any evidence that the owner assumed or exercised control over the building in the process of construction; it did not assume or exercise any control of Hiller’s employees in the stripping of the pans. There was no evidence that the owner was negligent in selecting the general contractor. Plaintiffs rely on the testimony of William E.
 
 *528
 
 McDonough, a vice president of the owner. Mr. McDonough testified: he was around the building daily to watch the progress of the work; he is familiar with construction operations “just as any layman is who has seen a number of them built, and who has invested in them ”; he was familiar with the stripping operation only to the extent he knew it was going on; he observed that all of the things to be done under the contract seemed to be done during the course of the job; he visited there every day and he saw many safety precautions being taken; he was a “victim” of a number of them; he was not permitted to go into certain areas; prior to April 23, 1956, he did not recall anything covering any of the openings on the sides of the building to prevent objects from falling below, other than scaffolding which was there from time to time. There was no evidence that the owner at any time assumed control, interfered with, or directed the general contractor or any of the subcontractors in their independent operations, and particularly in the work being performed by Hiller and its employees.
 

 The evidence does not present a factual situation in which an owner may be liable for injuries to an employee of an independent contractor. As said in
 
 McDonald
 
 v.
 
 Shell Oil Co., supra,
 
 44 Cal.2d 785, 790, “. . . the owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect [citation], the right to stop the work [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations-or deviations in the work [citation]—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship. . . . Various factual situations in which an owner may be liable for injuries to the employee of the independent contractor should be distinguished: (1) This is not a case where the employee of the independent contractor was injured by some condition of the owner’s premises over which the owner remained in control, and where the owner’s duties to the employee were those owing to a business invitee [citations] ; (2) Nor is this a case where the owner furnished the equipment or was obligated by contract to do so, and the equipment proved to be defective, causing injury to the employee of the independent contractor [citations] ; (3) Finally, this is not a case where the owner actively interfered with or arbitrarily assumed to direct the employees of the independent
 
 *529
 
 contractor as to the manner and method of performing the work. [Citations.] Likewise distinguishable is
 
 Snow
 
 v.
 
 Marian Realty Co.,
 
 212 Cal. 622 [299 P. 720], where the owner’s liability for damages stemmed not from responsibility for the negligent acts of the independent contractors but from the allowance of work on its property constituting a nuisance.” The facts in the present case do not bring it within any of these exceptions to the general rule.
 

 Plaintiff cites Labor Code, section 6304, which reads: “ ‘Employer’ shall have the same meaning as in section 3300 and shall also include every person having direction, management, control, or custody of any employment, place of employment, or any employee. ’ ’
 

 “To make the owner responsible as ‘employer’ under section 6304 of the Labor Code, as construed by the cases the dangerous condition must exist in the place of employment when it is turned over to the contractor.”
 
 (Johnson
 
 v.
 
 A. Schilling & Co.,
 
 170 Cal.App.2d 318, 323 [339 P.2d 139].)
 

 Cases relied on by plaintiffs are not analogous. In
 
 Pauly
 
 v.
 
 King,
 
 44 Cal.2d 649 [284 P.2d 487], the owner was also the general contractor. In
 
 Atherley
 
 v.
 
 MacDonald, Young
 
 &
 
 Nelson, Inc.,
 
 142 Cal.App.2d 575 [298 P.2d 700], the owner was also the builder; the contractor was not an independent contractor. In
 
 Crane
 
 v.
 
 Smith,
 
 23 Cal.2d 288 [144 P.2d 356], in
 
 Dobbie
 
 v.
 
 Pacific Gas & Elec. Co.,
 
 95 Cal.App. 781 [273 P. 630], and in
 
 Bickham
 
 v.
 
 Southern Calif. Edison Co.,
 
 120 Cal.App.2d 815 [263 P.2d 32], the owner was in control of a defective condition. The owner was not a party to the action in
 
 Florez
 
 v.
 
 Groom Development Co.,
 
 53 Cal.2d 347 [1 Cal.Rptr. 840, 348 P.2d 200], or in
 
 Revels
 
 v.
 
 Southern Calif. Edison Co.,
 
 113 Cal.App.2d 673 [248 P.2d 986].
 

 In the case at bar the evidence was that the accident did not occur as the result of the owner’s failure to furnish a reasonably safe place for Gonzales to work. The evidence was insufficient to support the finding that the owner was negligent.
 

 We conclude that the record shows no basis for establishing liability on the part of defendant 6505 Wilshire Bldg. Corporation.
 

 The Case Against the General Contractor
 

 Section 6400 of the Labor Code provides: “Every employer shall furnish employment and a place of employment which are safe for the employees therein.
 
 ’ ’
 

 
 *530
 
 Section 6401 reads: “Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes, which are reasonably adequate to render such employment and place of employment safe. Every employer shall do every other thing reasonably necessary to protect the life and safety of employees. ’ ’
 

 Section 6403 reads: “No employer shall fail or neglect:
 

 “ (a) To provide and use safety devices and safeguards.
 

 “(b) To adopt and use methods and processes reasonably adequate to render the employment and place of employment safe.
 

 “(c) To do every other thing reasonably necessary to protect the life and safety of employees. ’ ’
 

 These statutes apply to the general contractor.
 
 (Atherley
 
 v.
 
 MacDonald, Young & Nelson, Inc.,
 
 142 Cal.App.2d 575 [298 P.2d 700];
 
 Maia
 
 v.
 
 Security Lumber
 
 &
 
 Concrete Co.,
 
 160 Cal.App.2d 16 [324 P.2d 657];
 
 Johnson
 
 v.
 
 A. Schilling & Co.,
 
 170 Cal.App.2d 318 [339 P.2d 139].)
 

 An employee of a subcontractor occupies the relation of an invitee to the general contractor.
 
 (Florez
 
 v.
 
 Groom Development Co.,
 
 53 Cal.2d 347, 354-355 [1 Cal.Rptr. 840, 348 P.2d
 
 200]; Revels
 
 v.
 
 Southern Calif. Edison Co.,
 
 113 Cal.App.2d 673, 677 [248 P.2d 986].) The duty owed by the general contractor to such employee is the duty owed by one to invited persons.
 
 {Fountain
 
 v.
 
 Willard-Slater Co.,
 
 172 Cal. 129, 131 [155 P. 630];
 
 Lucas
 
 v.
 
 Walker,
 
 22 Cal.App. 296, 299-300 [134 P. 374].) The duty is to exercise ordinary care to keep the premises in reasonably safe condition, or to warn of danger.
 
 {Raber
 
 v.
 
 Tumin,
 
 36 Cal.2d 654, 658 [226 P.2d 574].) The inviter is required to protect his invitees not only from dangers created by him or of which he has knowledge, but from those dangers which by the use of reasonable care he should have had knowledge.
 
 {Austin
 
 v.
 
 Riverside Portland Cement Co.,
 
 44 Cal.2d 225, 233 [282 P.2d 69].) Lack of actual notice is no defense if there was an opportunity to inspect and such inspection would have revealed the dangerous condition.
 
 {Florez
 
 v.
 
 Groom Development Co.,
 
 53 Cal.2d 347, 357 [1 Cal.Rptr. 840, 348 P.2d 200].)
 

 The contractor ... has supervision over the entire building and its construction, including the work performed by a subcontractor.... He is in full control of the construction. ‘The general rule is that a general contractor on a construction job who is in control of the premises
 
 *531
 
 is burdened with the duty to use ordinary care to provide a safe place for employees of a subcontractor to work, including the duty to warn such employees of a danger, either known to the general contractor, or discoverable by the exercise of ordinary care, or otherwise to protect the employees from injury, and to avoid exposing them to injury on account of dangerous conditions. He is bound to take reasonable measures to protect the employees of a subcontractor from injuries likely to arise from places of danger about the building. If he neglects this duty by failing to give adequate notice or warning of the existence of a place of danger, he may be found liable to an employee of a subcontractor for resulting injury. ’ ”
 
 (Johnson
 
 v.
 
 Nicholson,
 
 159 Cal.App.2d 395, 406-407 [324 P.2d 307].) “As a part of supervising the work, it is the duty of the general contractor to oversee conditions in the work of each subcontractor so far as they affect the safety of the employees of a subcontractor.”
 
 (Revels
 
 v.
 
 Southern Calif. Edison Co.,
 
 113 Cal.App.2d 673, 678 [248 P.2d 986].)
 

 Jean Cacan was the general contractor’s superintendent in charge of the job. He testified: It was his responsibility to see that the men on the job were furnished with a reasonably safe place to work. He knew there was danger of people being injured from falling objects if precautions were not taken against that eventuality. At the time of the accident Hiller’s men were stripping down from the seventh floor. They were working in the middle bay of the west edge of the building. The bay was completely open except that a wooden form, 3 or 4 inches high, was in place. The entire top of the bay, some 3 feet or more, was completely open, with no floor in it. Hiller had told him how the stripping was to be done and he had agreed that was the best way. On the day of the accident he watched the operations by Hiller’s employees in stripping the concrete on the seventh floor. The scaffolds on which Hiller’s employees stood did not have solid floors; they were “about 50% covered.” He had seen pans fall to the scaffold at least once a week. He was asked and answered: “Q. After you saw these pans dropping, did you ever talk to the Hiller foreman about changing the method of stripping, or putting some kind of blocking device up on the edge of the building or the edge of the scaffold to keep these pans from falling out the edge of the building? A. No.” Before the accident, other objects had fallen. He knew before April 23, 1956, that on March 29, 1956, another person who
 
 *532
 
 worked for Meehleis had been injured on the same job by an object falling from above, striking him on the head while he was working on the west side of the building. After the accident he did not do anything more to prevent objects falling than what he “had been regularly doing on the job.” Asked what he had been doing to prevent falling objects, or what he had put up to prevent their falling, he replied, “Well, from men falling
 
 off
 
 we put a rope around the outside edges. That would keep the men from falling
 
 off.”
 
 The rope was three-quarters or one inch in diameter. It hung from the upright beams across the bay and formed “kind of a handrail.”
 

 Mr. Cacan was asked, “What else did you have there to prevent falling objects besides that rope to keep the men from falling?” He replied: “We put tarpaulins up”; the “purpose of the tarpaulins was to prevent anything from falling over the edge,” such things as “pieces of wood, pieces of rock or pieces of steel or pieces of concrete.” The tarpaulins were put up by the general contractor. There was no tarpaulin in the bay where the deceased was working. The rope was the only protective device to keep things from falling over the edge of the building. He testified further: “Q. You never in any way corrected the method of work of the Hiller personnel, did you? A. That’s right. Q. You did not? A. No, sir. Q. Incidentally, these tarps were used between the sixth and the seventh floor, weren’t they? A. I think so. Q. You also knew before the date of this accident, Mr. Cacan, that sometimes more than one pan would fall down at a time, didn’t you? A. Yes. . . . Q. You never suggested that a handrail or a piece of 2 x 4 or a piece of reinforced plywood be put on the edge of that scaffold to keep the pans that fell on that scaffold from falling over the edge, did you ? A. No. Q. There was a wood canopy on Wilshire Boulevard to protect the members of the public passing under that canopy from falling objects, was there not? A. That’s right. Q. Was there any other protection on the west side of the building for the safety of the men on the job, similar to that or equivalent to that? A. No.” The tarpaulins were used on the Wilshire side of the building. They were not used on the lower level floors because a canopy which covered the sidewalk “was out far enough to protect the public from getting hurt.” At no time were any tarpaulins used in connection with the stripping of pans. It was not the custom or usage in the Los Angeles area in April, 1956, to cover openings with nets or tarpaulins when stripping pans. In raising the structural steel, in laying loose floor planks,
 
 *533
 
 and in installing forms for concrete, lie had seen objects drop, such as bolts, rivets, a wrench. No net or tarpaulin was used to catch falling objects, and it was not the custom to use them. He knew before April 23, 1956, that “around the building was a dangerous place with respect to objects falling over the side of the building.” No provision similar to the use of tarpaulins on the Wilshire elevation was made to protect people on the west side of the building.
 

 Mr. Cacan testified further: After the accident the deceased was lying inside the building with his feet 6 or 8 inches east of the west edge of the building. His red baseball cap was beside him. He had been working on the outside edge from the inside. He was required to stand inside on the floor, placing a reinforcing rod 3 inches inside the outer edge of the building.
 

 There was testimony by various witnesses that they had not seen pans fall outside the building before this accident. Three experts testified the stripping was done in a usual and customary manner.
 

 The evidence, viewed in the light most favorable to plaintiffs, was that Cacan and Hiller agreed on the method of stripping pans. Cacan knew of the danger from falling objects. He knew of the accident on March 29, 1956, but thereafter did not do anything more to prevent objects from falling than what he “had been regularly doing on the job,” which was to put a three-quarter- or one-inch rope around the edges of the building to keep the men from falling off. To prevent objects from falling, he also put up tarpaulins on the public street side of the building to protect the public, but they were not used to protect the workmen on the other sides. There was none over the bay where Hiller’s men were stripping pans or over the bay where the deceased was working. The scaffold on which Hiller’s men were working was “about 50% covered. ’ ’ Cacan knew that pans fell to the scaffold and, at times, to the floor below. He did nothing about it. When the stripping operation was being done at a bay adjacent to the outer edge of the building, there was nothing to prevent the pans from bouncing on the scaffold through a bay and falling below. On the day of the accident, Hiller’s men were stripping pans in the middle bay on the west edge of the building. The bay was completely open except that a wood form 3 or 4 inches high was in place. The entire top of the bay, some 3 feet or more, was completely open. There was a hazard that
 
 *534
 
 one or more pans would tumble over the unprotected edge of the building to levels below. The bay on the second floor was open. There was a scaffold immediately outside the bay. Gonzales was working near the outer edge. There was a danger that a falling object would hit the scaffold and bounce into the bay. On this evidence the trial court could conclude that the general contractor did not provide the deceased with a reasonably safe place to work.
 

 It is argued that because three qualified experts testified the stripping was done in the usual and customary manner, and because the uncontradicted evidence established there was no custom or usage in the industry to use tarpaulins in the pan-stripping operation, the finding with respect to the general contractor is unsupported. While failure to observe custom may be evidence of negligence, the standard of due care is not fixed by custom or altered by its presence or absence.
 
 (Pauly
 
 v.
 
 King,
 
 44 Cal.2d 649, 655 [284 P.2d 487].)
 

 We conclude the finding that the general contractor was negligent is supported by the evidence.
 

 The judgment as to 6505 Wilshire Bldg. Corporation is reversed; as to P. J. Walker Company, it is affirmed.
 

 Shinn, P. J., and Ford, J., concurred.
 

 A petition for a rehearing was denied May 5, 1960, and the petitions of appellant P. J. Walker Company and of the respondents for a hearing by the Supreme Court were denied June 2, 1960. Peters, J., was of the opinion that the petitions should be granted.