[Civ. No. 47766. Second Dist., Div. Five. Jan. 31, 1977.]

KEITH W. ELDER et al., Plaintiffs and Appellants, v.
PACIFIC TELEPHONE AND TELEGRAPH COMPANY et al.,
Defendants and Respondents.

## Counsel

Grundell, Smith & Farmer and J. Edmund Smith for Plaintiffs and Appellants.

Duenow & Burke, E. Jeffrey Burke, Tom Halde, Edward L. Lascher and Jeffrey D. Jennings for Defendants and Respondents.

## Opinion

**STEPHENS, J.**—Plaintiffs Keith W. Elder and Earl Jeffrey Rogers filed this action against defendants Pacific Telephone and Telegraph Company (Pacific Telephone) and Wally La Freniere Construction Company (La Freniere) and Central Coast for personal injuries suffered in a construction accident. A nonsuit was granted as to Central Coast and no appeal taken therefrom. This appeal was taken when the trial court granted a judgment of nonsuit as to defendants Pacific Telephone and La Freniere at the close of plaintiffs' case on liability.

### FACTS

In an effort to expand its Paso Robles facility, Pacific Telephone entered into a contract with Wally La Freniere Construction Company in 1970 to construct an addition to the phone company's two-story building. La Freniere in turn awarded a subcontract to Watkins Construction Company for the removal of an existing fire escape. Both plaintiffs were then hired by Watkins.

The fire escape was comprised of a five-foot by ten-foot concrete slab extending from the second floor of the building which served as a landing. Egress from the building was provided by a five-foot wide double door which opened onto the landing, and by metal ladders which ran to the roof and to a smaller platform at the first floor level. The

landing was approximately eight inches thick, was bounded along its perimeter by a length of "channel iron" or "U-beam," and was supported by steel reinforcing rods, or "rebars" extending out from the second floor of the building into the concrete platform. The slab was also enclosed by a metal guard rail extending along its three exposed sides.

In devising a plan for removal of the fire escape Watkins' foreman requested from La Freniere a set of as-built plans for the building to determine how the landing was attached to the side of the building. None was available, so it was decided that the platform would be taken down in the following manner: first, the rebars would be exposed at the juncture of the landing and the building; second, the guard rail and ladders would be removed; third, a skiploader would be lowered in place under the landing while the rebars, and if necessary, the U-beam, would be cut; finally, the slab would be lowered to the ground by the skiploader.

It was plaintiff Elder's task to expose and cut the steel rebars supporting the fire escape landing. On August 8, 1970, the rebars were ready to be cut and plaintiff Rogers had been assigned to assist Elder in this effort. Testimony by the two plaintiffs as to the exact sequence of events on this day is somewhat contradictory, but it appears that Elder had been instructed to begin cutting the rebars with a torch while the skiploader was raised underneath the platform. Before the skiploader had been positioned, however, and while Rogers was busy removing the guard rail, Elder had already began to cut the last rebar. He cut half way through the rebar when it snapped causing the landing to fall abruptly to the ground, injuring both Elder and Rogers. Elder explained that he had erroneously assumed that the channel iron surrounding the slab would support the landing.

## DISCUSSION

Plaintiffs raise three major contentions on appeal in support of a reversal of the judgment—first, that the granting of a nonsuit on the ground that Elder's conduct was the sole proximate cause of the accident is improper since it effectively eviscerates the new comparative negligence system; second, that sufficient evidence was adduced at trial to establish a negligence cause of action against both La Freniere and Pacific Telephone; and third, that the trial court improperly excluded certain evidence. None of these contentions is supportable.

## I

Turning to the plaintiffs' first contention we note, with some astonishment, that appellant seems to propose that the question of whether a defendant's conduct was a proximate cause of plaintiffs' injury is one which should *always* be submitted to the jury under a system of comparative negligence. This proposition is derived from an observation by Professor Schwartz that the defense of contributory negligence has occasionally reappeared through the technique of characterizing the plaintiff's negligence as the "sole proximate cause" of his injuries, in spite of evidence to the contrary. (Schwartz, Comparative Negligence (1974) § 4.4, pp. 88-89.) Despite this danger, however, nonsuits have not been outlawed in California by the adoption of comparative negligence. ■ While a negligent plaintiff is no longer barred from recovery, but is entitled to recover damages diminished in proportion to the fault attributable to him (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 829 [119 Cal.Rptr. 858, 532 P.2d 1226]), the plaintiff may not recover without first establishing his case. A California plaintiff must still establish a prima facie case by proving that the defendant was negligent, and that that negligence was a proximate cause of his injuries, before there is anything against which his own negligence can be compared. Where either element of proof is lacking a nonsuit is justified (cf. *Aguilera* v. *Atchison, T. & S. F. Ry. Co.* (1961) 188 Cal.App.2d 274, 278-279 [10 Cal.Rptr. 367]), and the label "sole proximate cause" may properly be applied to plaintiff's conduct (see *Schwartz, supra,* at p. 91).

## II

In support of their second contention, attacking the nonsuit judgment, plaintiffs present us with several theories upon which liability of both Pacific Telephone and La Freniere might be predicated, but with meager reference to the record to demonstrate either the applicability of these theories or the sufficiency of the evidence to make out a cause of action under any one of them.

■ According to settled law, the granting of a nonsuit is proper " ' "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff . . . ." [Citations.] Unless it can be said as a matter of law, that, when so considered, no other

reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.' [Citation.]" (*Caswell* v. *Lynch* (1972) 23 Cal.App.3d 87, 92 [99 Cal.Rptr. 880].)

Assessing the record in light of the foregoing standards, we are nevertheless unable to find any evidence of sufficient substantiality to support a cause of action against either defendant upon any one of the following asserted negligence theories: (1) that a nondelegable duty to protect against a "peculiar risk" under section 416 of the Restatement Second of Torts was violated, or (2) that a direct duty to provide a safe place to work was breached under the common law obligations imposed upon an invitor, or under the statutory obligations imposed upon "employers" under Labor Code sections 6400 through 6402.

*The Peculiar Risk Doctrine*

Section 416 of the Restatement Second of Torts cited by plaintiffs provides for a form of vicarious liability in tort as follows: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise." ▇▇▇ Looking to the outlines of the peculiar risk doctrine as it has developed in California we have concluded that this doctrine is wholly inapplicable to the instant case.

▇▇▇ While the definition of a "peculiar risk" within the context of the Restatement is elusive at best, several cases have analyzed the concept. Generally speaking, a peculiar risk is one which inheres in the nature of the contractor's work. "While it is not essential that the work which the contractor is employed to do be in itself an extra hazardous or abnormally dangerous activity, . . . it must involve some special hazard resulting from the nature of the work done which in turn calls for special precautions."[1] (*Holman* v. *State of California* (1975) 53 Cal.App.3d 317,

---

[1] Comment d of section 416 of the Restatement Second of Torts illustrates this principle as follows: "[I]f a contractor is employed to transport the employer's goods by truck over the public highway, the employer is not liable for the contractor's failure to inspect the brakes on his truck, or for his driving in excess of the speed limit, because the

328 [124 Cal.Rptr. 773].) As Prosser described such a risk, it is "some rather specific risk . . . recognizable in advance as calling for definite precautions," the emphasis being "upon the 'peculiar' character of the risk, and the need for special, unusual care." (Prosser, Law of Torts (3d ed.) p. 486. See also *Anderson* v. *Chancellor Western Oil Dev. Corp.* (1975) 53 Cal.App.3d 235, 240-241 [125 Cal.Rptr. 640].) This concept of "peculiar risk" is strictly interpreted, however, in cases in which the party injured is an employee of the independent contractor (*Anderson* v. *Chancellor Western Oil Dev. Corp., supra,* at p. 243), and where such an injury results from the collateral negligence of the contractor in the performance of the operative details of the work, the employer cannot be held liable (*id.,* at p. 241).

 In analyzing the risks involved here in the removal of the fire escape by the subcontractor we take cognizance of the fact that demolition work, in the abstract, is such as may be susceptible to the application of the peculiar risk doctrine. Indeed, it may even be conceded that there were a number of such risks present here calling for the exercise of special precautions by the subcontractor: the risk that workmen might fall from the second floor landing while engaged in the removal of the guard railing or ladders, calling for the use of special equipment such as harnesses or lifelines; or, the risk that the cement slab once freed from the building would break up as it was being lowered to the ground, necessitating other special precautions for the safety of those in the vicinity of this operation. However, the risk which was in fact realized was not one inherent in the nature of the specific demolition operation involved here. Rather, the injuries which befell plaintiffs Elder and Rogers were essentially the result of Elder's own negligence in "sawing off the limb" upon which they both were standing.

It is manifest from the record that plaintiff Elder departed in several respects from the plan which had been devised for the removal of the cement landing. First, he cut all but one of the steel reinforcing rods supporting the landing, and had proceeded to cut into the last rod before the skiploader had even began to move into position underneath the platform. True, Elder had erroneously assumed that the steel U-beam bounding the cement slab on three sides would provide support for the

risk is in no way a peculiar one, and only an ordinary precaution is called for. But if the contractor is employed to transport giant logs weighing several tons over the highway, the employer will be subject to liability for the contractor's failure to take special precautions to anchor them on his trucks."

platform, yet neither his immediate employer, nor La Freniere nor Pacific Telephone did anything to foster such an assumption.[2] Second, he and Rogers were *on* the landing at the time the reinforcing rods were being cut. There was nothing in the demolition plan nor in the instructions from his supervisor which mandated such a precarious stance.[3] His coworker, Rogers, who had never before been involved in construction work, evidenced his concern over this course of action. Even granting that Elder's assumption that the U-beam in fact extended into the building and somehow supported the weight of the landing, his actions bordered on the foolhardy.

*Addison* v. *Susanville Lumber, Inc.* (1975) 47 Cal.App.3d 394 [120 Cal.Rptr. 737], involved a situation similar to the one at bench. There, an employee of a subcontractor, employed by the general contractor to construct a logging road, was killed when he incorrectly felled a tree. The deceased was an unskilled laborer who, on occasion, was employed by the subcontractor to fell trees. He had insufficient experience to safely perform such a task and was neither supervised nor aided by one with sufficient tree-felling experience. In affirming a judgment of nonsuit, the Third District Court of Appeal held that the peculiar risk doctrine under section 416 of the Restatement Second of Torts was inapposite. The court explained that, "[i]t is axiomatic that every person who employs any contractor may anticipate that if the contractor hires untrained or otherwise incompetent employees, they will do their work unsatisfactorily, thus perhaps endangering themselves and third persons. Such a risk is ever present. But there is nothing peculiar or special about it; on the contrary it is common and general, and applicable to virtually every activity." (*Id.,* at p. 402.)

In view of the *Addison* case, and the policy behind the peculiar risk doctrine we cannot here shift the blame to the employer, general-contractor, by characterizing this case as one in which injury resulted from the failure of the employer to take special precautions against a special, recognizable danger. It may be conceded that the instant injury may have been averted if the general contractor had provided plaintiffs with safety harnesses. Yet the demolition plan as conceived by both the

[2]The U-beam was painted the same color as the building and was mortared at the two points where it abutted the building, so it was difficult to tell whether or not it was anchored to the building.

[3]Elder testified that he had been told to keep the double doors facing the landing partially closed to reduce the noise inside the building, that no one had *told* him to stand inside the building while cutting the rebars.

general contractor and its subcontractor certainly negated the general danger that the fire escape landing might come down while workers were still on it, and it was only plaintiffs' careless deviation from this plan which caused their injuries. We therefore hold, as a matter of law, that section 416 of the Restatement Second of Torts has no application to the case at bench.

*The Common Law Duty to Provide a Safe Place to Work*

It has long been held in California that the employee of a subcontractor is the invitee of the general contractor. (*Souza* v. *Pratico* (1966) 245 Cal.App.2d 651, 656 [54 Cal.Rptr. 159].) As a result of this relationship "the general contractor exercising supervision over a construction job owes the employees of a subcontractor a common law duty to exercise ordinary care to provide them with a reasonably safe place to work, or to warn them of dangers which are not obvious." (*Id.*) Furthermore, the substantive duties with which a general contractor is charged remain unaltered following the decision in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (repudiating the trespasser-licensee-invitee classifications with respect to the liability of possessors of land). (*Beauchamp* v. *Los Gatos Golf Course* (1969) 273 Cal.App.3d 20, 27 [77 Cal.Rptr. 914]. See generally 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 570-572, pp. 2836-2839.) Plaintiffs seize upon these principles, and in particular the case of *Florez* v. *Groom Development Co.* (1959) 53 Cal.2d 347 [1 Cal.Rptr. 840, 348 P.2d 200], as mandating a jury issue on the question of the general contractor's negligence. The crucial flaw in this argument, however, is that it presupposes that the danger here was not an obvious one.

The general contractor clearly is not an insurer of the safety of the employees of a subcontractor and cannot be held liable for an injury resulting from a danger which was obvious or which should have been observed in the exercise of ordinary care. (*Souza* v. *Pratico, supra,* at p. 657.) Moreover, the general contractor is not chargeable as an invitor in cases in which its relationship with the subcontractor is so attenuated, or where it retains such a small quantum of control over the subcontractor, as to make protective measures unfeasible. (See *Caswell* v. *Lynch, supra,* 23 Cal.App.3d 87, 91.)

Without even exploring the matter of the general contractor's control over the work of its subcontractor, however, we feel that the danger here realized was sufficiently *obvious* so as not to charge the

general contractor with a duty to warn. This is not a case involving a concealed hazard which was known to the general contractor or which might have been discovered in the exercise of reasonable diligence. In fact, there was nothing at all hazardous about the fire escape at the time demolition was begun by the subcontractor; neither was the method of demolition selected inherently dangerous. Unlike the situation in *Florez v. Groom Development Co., supra,* where the hazard was created by the general contractor in laying a plank across a ditch and onto loose dirt, the "hazard" cited by plaintiffs in the instant case was essentially one of their own making. Such a hazard was comprised of the following elements—first, that a worker would assume that the steel U-beam skirting the cement slab landing was structural, or that it extended into the building rather than abutting the building, as it actually did; second, that that worker would then proceed to cut all the steel reinforcing rods rooting the landing to the building; third, that this would be done while the worker was on the landing and, contrary to the plan, before the skiploader was raised up underneath the landing to provide support. Even if the U-beam were attached to the building, there was no showing that it might support the weight of the cement slab and the two men. Thus, Elder had exposed himself and Rogers to the rather obvious danger of having the landing collapse underneath them.

Furthermore, even if we assume that the danger here was not obvious, there is no showing that such a danger was known to either La Freniere or to Pacific Telephone,[4] or that it should have been known by either defendant. In fact, to hold that such a danger was foreseeable would require not just prudence on defendants' part but prescience. Accordingly, we hold that defendants were under no common law duty as invitors to warn or protect against this danger to plaintiffs.

*The Statutory Duty to Provide a Safe Place to Work*

Labor Code sections 6400, 6401 and 6402[5] impose both general and specific duties upon an "employer" to provide a safe place to work for

---

[4]No "as-built" plans which might have disclosed whether or not the U-beam was anchored in the building were available, and La Freniere never checked the U-beam before the accident to see if it went into the building. La Freniere testified that he hadn't paid much attention to the matter since he knew that the U-beam was "only a matter of something to hold the hand rail to or use as a form to make an edge for the concrete."

[5]Labor Code section 6400 provides: "Every employer shall furnish employment and a place of employment which are safe and healthful for the employees therein."

Labor Code section 6401 provides: "Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations,

his employees. An "employer" under the language of section 6304 of the Labor Code, in effect at the time of the accident,[6] is "[any] person having direction, management, control, or custody of any employment, place of employment, or any employee."

. On the issue of control, the evidence here fails to establish or even permit the inference that either La Freniere or Pacific Telephone exercised, or had the power to exercise, on-the-job direction of the operative details of the demolition work. As to La Freniere the evidence shows only that the subcontractor, Watkins, worked out a demolition plan with La Freniere.[7] But there is nothing in the record to indicate that La Freniere or any of his employees were even present during removal of the landing, much less exercising detailed supervision. The La Freniere-Watkins subcontract was never offered into evidence, so La Freniere's powers of supervision over Watkins are only a matter of speculation. As to Pacific Telephone, evidence relating to its control of the demolition project is even scantier. Two building engineers for Pacific Telephone testified that they had general planning and supervisory powers with respect to the improvements. This evidence, however, suggests nothing more than control over satisfactory results and not the detailed supervision contemplated by the relied-upon authorities. Moreover, the contract between Pacific Telephone and La Freniere was excluded from evidence on objection by defendants. Without the requisite employer-employee relationship under the Labor Code, defendants cannot be held accountable for the alleged violation of certain construction safety orders applicable to such employers. (See *Kuntz* v. *Del E. Webb Constr. Co.* (1961) 57 Cal.2d 100, 106-107 [18 Cal.Rptr. 527, 368 P.2d 127]. See generally Brooks, *Tort Liability of Owners and General Contractors for On-the-Job Injuries to Workmen* (1965) 13 UCLA L.Rev. 99, 117-123.)

## III

Plaintiffs' final objection to the nonsuit judgment is that the trial court erroneously excluded the contract between Pacific Telephone and La

and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees."

Labor Code section 6402 provides: "No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful."

[6]As of April 1, 1972, section 6304 was amended to delete this definition.

[7]James Rice, Watkins' foreman, testified by deposition as follows: " 'Question: Is it fair to say that you took your instructions on how to demolish this fire escape from Mr.

Freniere and opinion testimony sought from an expert witness respecting the applicability of certain construction safety orders. This objection is wholly without merit.

The record indicates that plaintiffs sought to introduce into evidence certain portions of the construction contract between the defendants. Both defendants objected and the matter was argued outside the presence of the jury. After taking the matter under submission, the court ruled that no part of the agreement between the parties would be admitted into evidence. Neither the objections of defendants, the argument of counsel, nor the ruling of the court are reflected in the transcript. Plaintiffs have the obligation on appeal to affirmatively demonstrate error in the lower court's rulings, and since the record is silent on this matter we must assume the correctness of the trial court's ruling. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 235, pp. 4225-4226, and cases cited therein.)

Plaintiffs also called an architect to testify as to the custom and practices in the construction industry, and sought his opinion as to the *applicability* to defendants of certain construction safety orders relating to demolition work. The latter opinion was properly excluded. While an expert witness may properly testify as to custom and practice in construction safety (*Alber* v. *Owens* (1967) 66 Cal.2d 790, 800 [59 Cal.Rptr. 117, 427 P.2d 781]), he may not state interpretations of the law, whether it be of a statute, ordinance or safety regulation promulgated pursuant to a statute (see Evid. Code, §§ 720, 803; cf. *Hyman* v. *Gordon* (1973) 35 Cal.App.3d 769, 774-775 [111 Cal.Rptr. 262]).

### CONCLUSION

Because we are unable to find any evidence supporting a negligence cause of action against either La Freniere or Pacific Telephone, and because no such evidence was improperly excluded by the trial court, the judgment of nonsuit as to both defendants must be affirmed.

Kaus, P. J., and Hastings, J., concurred.

---

La Freniere? [¶] 'Answer: We worked it out together, really. We talked about how to do it and then we both agreed on it.' "