[Civ. No. 17175. Third Dist. Jan. 8, 1980.]

REID MACKEY, Plaintiff and Respondent, v.
CAMPBELL CONSTRUCTION COMPANY et al., Defendants
and Appellants.

**COUNSEL**

Bronson, Bronson & McKinnon, Frederick A. Morgan, Richard T. Bowles and Michael P. Verna for Defendants and Appellants.

Boccardo, Lull, Niland & Bell and Edward J. Niland for Plaintiff and Respondent.

**OPINION**

**REGAN, Acting P. J.**—Defendants appeal from a judgment entered upon a jury verdict in favor of plaintiff awarding him damages for personal injuries.

It is defendants' basic contention on appeal that as owners (Western Electric) and general contractors (Campbell Construction) they owed no duty of care, as a matter of law, to plaintiff, an employee of a subcontractor. Principally at issue is the application of the "peculiar risk of harm" doctrine which provides an exception to the general rule that owners and general contractors are not liable for injuries to employees of independent contractors.

Defendants also contend there are instructional errors and that it was error to admit testimony of one witness on the custom and practice of scaffold assembly in California and to limit cross-examination of the witness.

We find no reversible errors and affirm the judgment.

FACTS

On appeal, we must look at the facts in the light most favorable to the prevailing party. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

Defendant Western Electric Company (Western) had an engineering division, part of which was devoted to plant design and construction. Western's engineers had designed a large warehouse or material management center which contained about 13 acres under one roof, approximately 805 feet by 680 feet and about 40 feet in height.

Western hired defendant Campbell Construction Company (Campbell) to act as a management contractor, not as a general contractor to construct the entire building. This was done so that Western could work more closely through its own personnel with Campbell in selecting sub-

contractors. It is a type of construction contractual relationship wherein the owner (Western) participates more directly at all times in the project and both the owner and the contractor (Campbell) communicate more closely with the subcontractors. To this end the entire plans and specifications are not completed at the inception of the whole job, but the work is done in stages.

Western's representatives were on the job at all times. Western's engineers were in constant communication with Campbell's project manager and superintendent and they worked as a team. One of Campbell's functions was to solicit bids from subcontractors at various stages and Western had the final approval of the contract with each selected subcontractor. Walter Ringen, Jr., chief engineer for Western's construction division, was responsible for overall management of the project and was ultimately in charge.

Campbell was basically responsible for safety on the job but Western had power to order subcontractors to take safety measures if a hazard came to its attention, in which case it would usually refer the matter to Campbell.

Campbell entered into a subcontract with The Brookman Co., Inc. (Brookman) to furnish and install aluminum insulated metal wall panels or siding (exterior sheet, interior sheet and fiberglass insulation).

Before Brookman commenced its work, Walter Ringen of Western and Tom Worth, Campbell's project manager, had a meeting with Louis Mutschler, Brookman's foreman, to discuss the work and the method to be used in doing it. Ronald Swickard, Campbell's project superintendent, also met with Mutschler to talk about the use of a rolling scaffolding known as "the farm wagon." Western always sat down with subcontractors to find out how they were going to do their job, and if it didn't like the way they were going to do it, they would ask for a change. Initially some consideration was given to the use of a roof scaffolding rather than the rolling scaffolding which Brookman proposed to use, but it was decided to allow Brookman to use the rolling scaffolding. Campbell had the power and authority to tell Brookman not to use this equipment on the job. Mutschler testified that if Campbell were to tell him not to do something, he would not do it.

A model of Brookman's rolling scaffold or farm wagon was used during the trial. The scaffold consisted of a wagon chassis, which had four

wheels with hard rubber truck tires, on which frame sections consisting of tubular steel with cross braces were installed. Other sections were then bolted on top of these sections. Normally only one section, ten feet long, six feet high and five feet wide, was placed on the wagon, but Mutschler decided to stretch it out by adding another section at each level.

When it was assembled at the job site, the entire scaffold was 5 sections high, 30 feet up from the base; 2 sections long, a total length of 20 feet; and 5 feet in width. The wheel base of the wagon chassis was 6 feet, and the base itself was 36 inches above the ground. There was a ladder on the exterior of the assembled scaffold, so that the workmen had access to the various levels. Aluminum planks with 2- by 12-inch wood backings were located along the entire side of the scaffold which would be against the wall of the building. The location of these planks affected the center of gravity of the scaffold.

Representatives of Western and Campbell had some doubts about the safety of the scaffolding. Ringen had never seen a rolling scaffold this high. He thought it appeared unstable, but would be satisfactory when tied into the building with outriggers behind it. He was aware that during Brookman's work, the scaffold had to be moved, which required it to be untied from the building and the outriggers carried on each side by the workmen. Mutschler had described to Ringen the method by which he had relocated the scaffold on a previous job as that project went ahead. Ringen knew that the scaffold was to be hooked to a pickup truck for the move, but he did not know that it was to be moved without removing any of the top sections. If he had known, he still would have allowed them to do it this way, even though he could have ordered Brookman to break it down. He also could have stopped the move if he thought it was unsafe. He was aware there was a risk of the scaffold tipping, and he agreed that if two or three sections had been taken off before the move, it would have been safe because there would have been a better ratio between the top and the bottom. Ringen was aware that the aluminum planks and equipment on the scaffold affected its center of gravity.

In the area where the accident occurred, there was a downhill grade of about 2 percent. It was Ringen's opinion that the scaffold fell when it was caught by a gust of wind once it went beyond the edge of the building. He agreed that if a mere gust of wind could tip the scaffold, the maneuver of moving it was a very delicate one. He knew the

risks and dangers involved in the move could be limited by taking the precaution of removing the top two sections. This would have substantially decreased the risk, and if the aluminum planks had been removed before the move, this would have distributed the weight in the scaffold more evenly.

Campbell considered the safety of any equipment used by a subcontractor on the job. Swickard expressed several misgivings about the use of the farm wagon. He was concerned about moving it. It seemed to be higher than he had ever seen before, and he told Mutschler that he was concerned about it tipping over. He was not concerned about using it when it was tied to the building and supported by outriggers behind it; he was only concerned with a movement, such as the one during which the accident occurred. Swickard was familiar with the principle in the industry that on a free-standing scaffold the height should never be more than three times the base so that it would be stable and not tip over. He knew that the scaffold did not conform to this ratio, and this was one of the factors he considered when he expressed concern about moving it away from the building. He did not know whether it could be moved safely at its full height with all the planks, fasteners and tools on it. Looking at the scaffold, and knowing how it was to be moved, he felt that there were inherent dangers in this move, which could vary according to circumstances and these dangers could have been minimized by taking precautions. The problem could have been helped by downward dismantling to a three-to-one ratio. If this had been done, there probably would have been no need for the outriggers on the sides. He could have insisted that the scaffold be broken down in this manner, and if he had not been convinced by Mutschler that the move could have been made safely, he would have stopped it. He knew that with all of the planks and equipment on the left side, there was a center of gravity problem; and that even the most careful men might have difficulty trying to hold the outriggers close to the ground. He was also aware that the higher the scaffold and the more problems with the center of gravity on one side, the more difficult it might be for men making such a sophisticated move to keep the outriggers at the proper height. He also knew that there were gusts of wind in the area.

Because of the inherent danger in the move, Swickard had suggested that if the scaffold started to tip, the men should put the outriggers on the ground and "run like hell." He thought that was a better plan than nothing.

Swickard went to the scene of the accident shortly after it happened. He observed that the scaffold had fallen on its left side, which was the side on which the planks and equipment had created a problem with the center of gravity. The ground sloped toward the left, which in itself would aggravate the problem. He noticed that the left outrigger, which plaintiff had been helping to hold, had failed and that it was bent about 90 degrees in the middle, indicating that it had been loaded beyond its capability to stop the scaffold from falling. Based upon his observation, Swickard testified that all of the factors which contributed to the accident were things within his knowledge before the accident happened.

Plaintiff's expert witness, David Beatty, owned his own scaffold business. His father had invented the type of scaffolding involved in this case, and Beatty had worked in the scaffolding business over 30 years. He testified it was the custom and practice in the industry in California to have a three-to-one ratio between the base and the height of such scaffolding. This is for the overall stability of the scaffold, and it is a concept of safety for men on the platforms and on the ground both, whether the scaffold is stationary or moving. Beatty stated that in his opinion the three-to-one ratio had not been followed, and the actual ratio was more than five to one. If the top two sections had been removed, this would have conformed to the ratio of custom and practice in the industry in California. This ratio meant nothing when the scaffold was tied to the building, but it became very significant as soon as the scaffold was untied.

Jay Russell, an employee of the State Division of Industrial Safety and also a private consultant, was called as a witness by the defendants. He conceded that lowering the height of any free standing scaffold is one of the ways to make it less likely to tip over. Workers helping to move a scaffold are to be protected from falling scaffolds just as much as workers nearby. If two sections were removed to reduce the ratio to three-to-one before the move, it would be a very safe move and no outriggers would be needed, so that no workmen need be near the scaffold. If the outriggers were carried too high during a move or if the truck was going a little too fast, there could be a problem. If the scaffold started to wobble and the truck continued to go for a second after the men put the outrigger down, this might cause a problem because the outrigger would be ineffective for the moment. If the outrigger buckled in front of a man and he had no other place to go but run away from it, he could get caught. A scaffold over 30 feet high which was heavier on one side would be likely to act unfavorably with wind.

Some of the Brookman employees testified the scaffold had frequently wobbled. One testified that it always had a certain amount of movement whenever they moved it away from the building. After the accident, whenever the scaffold was moved, two sections were removed from the top and there was then no need to have outriggers. Mutschler testified that he insisted on doing this, and he could have done it before the accident, if he had thought of it.

I

■ Defendants contend as a matter of law, the "peculiar risk of harm" doctrine does not apply to the facts of this case and the trial court consequently erred in instructing the jury on the doctrine. We disagree.

■ The "peculiar risk of harm" doctrine is succinctly stated in the Restatement Second of Torts, sections 413 and 416. Liability is placed upon those who directly or indirectly employ independent contractors to do work which the employer should recognize as likely to create during its progress some peculiar unreasonable risk of harm to others unless special precautions are taken and the employer fails to provide these precautions or see to it the subcontractor provides precautions. The California courts have frequently had occasion either to apply this doctrine or to consider its application in various circumstances. (See, e.g., *Holman* v. *State of California* (1975) 53 Cal.App.3d 317, 331-335 [124 Cal.Rptr. 773]; *Griesel* v. *Dart Industries, Inc.* (1979) 23 Cal.3d 578, 586 [153 Cal.Rptr. 213, 591 P.2d 503]; *Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 509 [156 Cal.Rptr. 41, 595 P.2d 619]; *Stark* v. *Weeks Real Estate* (1979) 94 Cal.App.3d 965, 969 [156 Cal.Rptr. 701].)

Under the rules enunciated by the Restatement and applied by the courts, liability may be imposed upon an employer although the employer at the time he lets the contract has no reason to anticipate that conditions will arise which require special precautions to be taken, if in fact such conditions do arise and he knows or should know of them. (Rest.2d Torts, § 413, com. b.) Moreover, the *extent* of the knowledge of the employer and his experience in the field of work to be done is to be taken into account, i.e., the more extensive his knowledge and experience, the more applicable is the rule. (See Rest.2d Torts, § 413, com. f.)

A peculiar risk is one which arises out of the character of the work to be done or the place it is to be done and against which a reasonable person would recognize the necessity of taking special precautions. (Rest.2d Torts, § 413, com. b, § 416, com. b.) It is something other than the ordinary and customary dangers normally arising from the work as it is usually done. Thus, in the *Griesel* case, the Supreme Court held a trial court erred in failure to give peculiar risk instructions in regard to "trenching" on a construction project. The court told the jury that trenching (digging a ditch) is an ordinary and customary danger of construction work. The evidence showed that in the absence of special shoring or sloping the particular ditch was of a character where cave-ins were likely, and plaintiff was an employee of the subcontractor (as here) who was suing the owner, developer and general contractor. (*Griesel* v. *Dart Industries, Inc., supra*, 23 Cal.3d at pp. 586-587.)

It has been held that whether the work is likely to create a peculiar risk of harm during its progress unless special precautions are taken is ordinarily a question to be resolved by the trier of fact. (See *Walker* v. *Capistrano Saddle Club* (1970) 12 Cal.App.3d 894, 899 [90 Cal.Rptr. 912]; *Ferrel* v. *Safway Steel Scaffolds* (1962) 57 Cal.2d 651, 656 [21 Cal.Rptr. 575, 371 P.2d 311].)

Defendants argue that the accident in this case was caused solely by the casual or collateral negligence of Brookman. They have referred to no negligence on the part of Brookman other than its method of moving the excessively high rolling scaffold. "Casual" or collateral negligence has been described as negligence in the operative detail of the work as distinguished from the general plan or method to be followed. This distinction is not essentially one between operative detail and general method, but rather one of negligence which is unusual or abnormal, or foreign to the normal or contemplated risks of doing the work, as distinguished from negligence which creates only the normal or contemplated risk. (*Aceves* v. *Regal Pale Brewing Co., supra*, 24 Cal.3d at p. 510; Rest.2d Torts, § 426, com. a.)

In the present case the peculiar or special risk was inherent in the contemplated method of moving Brookman's scaffold. Where the employer should recognize that a risk is likely to arise as a result of a method of work which the employer knows that the contractor will adopt, this is clearly a peculiar risk within the rule. (*Griesel* v. *Dart Industries, Inc., supra*, 23 Cal.3d at p. 586; Rest.2d Torts, § 416, com. e.) A peculiar risk may arise out of a contemplated and unsafe method of

work adopted by the independent contractor. (*Gettemy* v. *Star House Movers* (1964) 225 Cal.App.2d 636, 643-645 [37 Cal.Rptr. 441].) In the present case defendants were fully aware of Brookman's method of moving its farm wagon scaffold, and they allowed this movement to take place without requiring the precautions which could have been taken.

There is no merit in defendants' assertion that the risk involved in the movement of the rolling scaffold was an ordinary common risk which was wholly apart from Brookman's work. This movement was a necessary and essential part of Brookman's work. If Brookman did not move its scaffold, it could not fulfill its contract to install paneling on the whole building. The risk involved in that movement was not that Brookman would carelessly cause a stable piece of equipment to fall, as in *Smith* v. *Lucky Stores* (1976) 61 Cal.App.3d 826 [132 Cal.Rptr. 628], relied upon by defendants. The risk was that the top heavy, unbalanced and unstable scaffold would tip over and injure the workmen who were attempting to move it by holding 30-foot outriggers a few inches from the ground on each side. The risk in this case was inherent in the method by which Brookman tried to move its equipment, not in some negligence in the performance of an operative detail wholly apart from that method.

As we have heretofore pointed out, the question of whether or not a particular activity involves a peculiar risk is essentially factual, not legal. Defendants have erroneously asserted that in this case the use of scaffolds does not constitute a peculiar risk of harm, as a matter of law. The cases cited do not support the proposition in light of this record.[1] *Griesel* v. *Dart Industries, Inc., supra*, 23 Cal.3d at pp. 586-587, in holding it was error to instruct the jury that in construction work trenching is an ordinary and customary danger and that trenching in and of itself is not a peculiar risk, pointed out that the question was not whether trenching work involved a peculiar risk in the abstract, but

---

[1]For example, *Anderson* v. *Chancellor Western Oil Dev. Corp.* (1975) 53 Cal.App.3d 235 [125 Cal.Rptr. 640], involved the accidental dislodging of a "stabbing board" which fell and struck the plaintiff. *Hard* v. *Hollywood Turf Club* (1952) 112 Cal.App.2d 263 [246 P.2d 716], involved a defective scaffold, supplied by the plaintiff's employer, which unexpectedly collapsed. *West* v. *Guy F. Atkinson Constr. Corp.* (1967) 251 Cal.App.2d 296 [59 Cal.Rptr. 286], involved a fall by plaintiff from a hanging scaffolding when, for unclear reasons, a hinge plate accidentally fell and cut the scaffolding in two. None of these cases can be sensibly regarded as purporting to establish any rigid rule of law pertaining to every scaffold everywhere under every set of circumstances.

whether the particular trenching work at the particular time in question involved a peculiar risk of injury. The Supreme Court stated: "The fact that an activity involves an ordinary and customary danger of the particular work to be performed is immaterial to the question of whether it may involve a pecular risk of harm within the meaning of the peculiar risk doctrine." (*Id.*, at p. 587.)

In this case the record shows there was nothing defective about Brookman's rolling scaffold when it was tied into the building and supported by outriggers behind it. However, there was a peculiar or special risk in moving this scaffold without removing the top sections so that it would have a safer height to width ratio. Its excessive height, together with the center of gravity problem created by having all of the planks on one side, made it hazardous to move in the manner intended by Brookman and known to defendants. Everyone, including defendants, knew that there were gusts of wind in the area and that once the unstable scaffold went beyond the protection of the building, it was vulnerable to the wind and to the slope of the ground which aggravated the center of gravity problem. Yet Brookman failed to remove the top sections, which it could have done and which it made sure to do after the accident. The defendants failed to exercise their admitted right and power to require that Brookman take these simple precautions which were needed to protect workmen such as plaintiff against the hazard which was so obviously involved in the precarious movement of the scaffold. Under these factual circumstances, the trial court not only properly gave the challenged three-part instructions on "peculiar risk of harm" (based on BAJI No. 13.21 and the Restatement of Torts) but it would have erred had it failed so to do.[2] (See *Griesel* v. *Dart Industries, Inc., supra,* 23 Cal.3d 578; *Aceves* v. *Regal Pale Brewing Co., supra,* 24 Cal.3d 502.)[3]

We have examined the cases cited by defendants which have held the "peculiar risk of harm" doctrine inapplicable. Each has turned on the court's conclusion that the risk was an ordinary one or one not related to any risk inherent in the particular work being performed. (See, e.g., *Addison* v. *Susanville Lumber, Inc.* (1975) 47 Cal.App.3d 394 [120

---

[2]We note, in fact, that *both* parties requested BAJI No. 13.21, which is a part of the peculiar risk of harm instructions.

[3]Contrary to defendants' assertions, the courts have specifically made it plain the doctrine is applicable to employees of an independent contractor (as here) as well as to third parties. (*Aceves* v. *Regal Pale Brewing Company, supra,* 24 Cal.3d at p. 509, fn. 1.)

Cal.Rptr. 737]; *Elder* v. *Pac. Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650 [136 Cal.Rptr. 203]; *Holman* v. *State of California, supra,* 53 Cal.App.3d 317; see also *Stark* v. *Weeks Real Estate, supra,* 94 Cal. App.3d 965.)

II

Defendants contend there were additional errors in either the giving or denying of instructions.

■ They contend that if giving the "peculiar risk" instructions was proper, it was error to deny defendants' proferred instructions which they describe as "concerning instances of inapplicability of the doctrine." The refused instructions to which defendants have reference stated that "[t]he use of a scaffold does not constitute an inherently dangerous or peculiar activity," and that "[t]he law does not impose upon the owner or general contractor the duty to warn the subcontractor against the use of his own scaffold." The first part of this instruction is of the exact nature disapproved in *Griesel* (23 Cal.3d at pp. 586-587). The second portion likewise does not state the law applicable to this case, since the record does not demonstrate a general situation in which a scaffold of the ordinary type was used and as to which the owner or general contractor would not have occasion to take particular notice. To the contrary, the record shows a situation in which not only was a unique scaffold being used but both the owner and the general contractor knew or had reason to know of its potential hazard. The giving of such an instruction was not only properly denied; it would have been error to give it under the facts of this case.

■ Defendants contend the trial court erroneously refused to instruct on the collateral negligence doctrine, i.e., the freedom from liability on the part of the employer for the contractor's negligence in acts not normally a part of the work. The trial court properly pointed out by written comment on the proferred instruction that collateral negligence of the independent contractor was covered in its instruction given at defendant's request based on Restatement Second of Torts, section 426, to the effect that the employer of an independent contractor is *not* liable for negligence of the independent contractor except under specific conditions, and is not liable for negligence not inherent in or normal to the work.

■ Defendants contend the trial court erroneously refused to give an "appropriate instruction" as to defective equipment. The trial court refused several proferred instructions on this subject. The refusal was proper since none of the instructions was "appropriate" to this case. Each was based on inappropriate quotations from various court decisions which would have erroneously treated *factual* issues as legal issues. The same problem exists with defendants' offered instructions on "general control and supervision." Moreover, the essential substance of these instructions was covered by the giving of BAJI No. 8.30 which makes it clear that if a subcontractor has taken over complete general control and supervision of a premise, the owner owes no duty of care to employees of the subcontractor.

■ Defendants assert the jury was "misled" by the giving of instructions based on BAJI Nos. 8.00, 8.01, 8.10 and 8.30. These instructions related to defective conditions and dangerous activities on land. Defendants claim the record shows no evidence of any involvement of the land with the injuries. This is not so. The record shows one of the factors which may have contributed to the tipping of the scaffold was a downhill grade of about two percent.[4]

■ Defendants claim error in the refusal of the trial court to instruct that any damages awarded plaintiff in this case would not be subject to state or federal income taxes. The proferred instruction in question was purportedly based on tax codes and a federal court decision. The committee on BAJI (6th ed. 1977) under the heading of BAJI No. 14.82, "warns against the giving of an instruction that the 'recovery is not subject to income tax.'" The California courts have held it is not error to refuse to give an instruction such as requested by defendants relative to income taxes. (*Henninger* v. *Southern Pacific Co.* (1967) 250 Cal.App.2d 872, 879 [59 Cal.Rptr. 76]; *Atherley* v. *MacDonald, Young & Nelson* (1956) 142 Cal.App.2d 575, 589 [298 P.2d 700].)

### III

■ Defendants contend it was reversible error to admit the testimony of David Beatty on the custom and practice of scaffold assembly in California and error to limit cross-examination of his testimony. What was at issue in this connection was the effort by plaintiff, through use of Beatty's testimony, to show the "custom and practice" in Califor-

[4]We note, also, that *defendants*, as well as plaintiff, requested the instructions in question.

nia in scaffolding was to maintain a height to width ratio of three to one while the actual ratio in this case was at least four to one and possibly more than five to one. Defendants pointed out to the trial court *in camera* that they believed Beatty's opinion was based solely on a CAL/OSHA regulation of three to one. However, Beatty insisted the regulation itself was based on earlier custom and practice in this state. Consequently, the trial court properly refused to apply the holding of *Spencer* v. *G. A. MacDonald Constr. Co.* (1976) 63 Cal.App.3d 836, 859 [134 Cal.Rptr. 78], prohibiting an expert witness from basing his opinion on a safety order such as a CAL/OSHA regulation. The court, instead, relied on *Spencer* to keep the safety order out of evidence and allow Beatty to testify as an acknowledged expert on custom and practices of scaffolding. In this connection, defendants' counsel was properly precluded from cross-examining Beatty on the CAL/OSHA regulation on the basis of the *Spencer* ruling.

■ Subsequent to the *in camera* proceedings above referred to, Beatty testified before the jury about the three-to-one ratio of stability in California. On cross-examination defendants' counsel attempted to question Beatty about a manual used by the Association of General Contractors which set forth the height-width ratio for each state. In some states the acceptable ratio is four to one. An offer of proof was made by defendants' counsel in chambers to the effect that he wished to ask Beatty about the four-to-one ratio, even though he was aware that Beatty would testify it did not apply in California. The court excluded, under section 352 of the Evidence Code, any questions about the standards of a national association outside of California. The court stated it would allow any evidence relative to custom and practice in California but not elsewhere. None was offered by defendants.

We have found no reversible error and have determined there is substantial evidence to support the verdict.

The judgment is affirmed.

Evans, J., and Blease, J., concurred.