[No. A048913. First Dist., Div. One. Oct. 29, 1991.]

MICHAEL S. JOHNSON et al., Plaintiffs and Respondents, v.
TOSCO CORPORATION, Defendant and Appellant.

COUNSEL

Murchison & Cumming, Rick K. Carter, Kleinman, Carroll, Lesselyong & Novak and James W. Carroll for Plaintiffs and Respondents.

McNamara, Houston, Dodge, McClure & Ney and Thomas G. Beatty for Defendant and Appellant.

OPINION

**NEWSOM, Acting P. J.**—By a complaint filed on January 21, 1988, in the Superior Court of Contra Costa County, Michael S. Johnson (hereafter Johnson) and his wife, Minnie L. Johnson (hereafter collectively respondents), brought this action for personal injury and loss of consortium against Tosco Corporation (hereafter Tosco) and certain other defendants, who were later dismissed. The jury returned a special verdict finding that Tosco was negligent, that its negligence was a proximate cause of Johnson's injury, and that Johnson suffered damages as a proximate result of the negligence in the amount of $1,029,904 and Minnie Johnson suffered damages for loss of consortium of $50,000. The jury further found that Johnson was negligent and ascribed to him 40 percent of the total negligence. On January 18, 1990, the court entered a judgment awarding Johnson damages against Tosco in the amount of $617,942.40 and Minnie Johnson damages of $30,000. Tosco filed a timely notice of appeal.

Johnson, age 38, claims damages for injuries suffered in a fall from a single-stage scaffolding at the Tosco Oil Refinery in Martinez, California. A trade union insulator from Phoenix, Arizona, he enjoyed full union accreditation and had worked in the insulating trade for several years. During 1986, he was forced to seek work in other states as a "traveler" through referrals in the union hall.

On December 28, 1986, Johnson was employed by Plant Insulation Company to work in a final stage of a project refitting a 3,000-4,000-foot steamline at the Tosco Oil Refinery to withstand pressures of 300 pounds per square inch. Several companies were involved in the project, each hired directly by Tosco. In the area of the accident, Corey Construction Company was responsible for erecting scaffoldings at all locations where work was required. Using this scaffolding, Plant Insulation Company first removed existing insulation, Corey Construction Company then installed the necessary fittings, and Plant Insulation Company returned to insulate the exposed portions of the line. Corey Construction Company finished its portion of the work by January 1, 1987, and removed about half of the scaffolding. It left the remaining scaffolding in place for Plant Insulation Company to use in the remaining insulation work.

The scaffolding was the "conventional variety" of tubular steel scaffolding. Each stage supported a platform about six feet above ground or above the lower level of scaffolding. There was no significant disagreement between respondents' expert witness, Thomas Boster, and the representatives of Tosco and Corey Construction Company concerning the safety standards for erecting scaffolding of this type. All agreed that the scaffolding should rest on base plates fitted with screw jacks to permit leveling of the platform on uneven ground. The frame required four cross-braces and two sets of hand rails. The platform should offer an unbroken surface, normally composed of five thick planks nine and one-half inches wide, and should be tied to the metal frame with heavy wire. The scaffolding should be erected by specially trained personnel and should never be moved or altered by workmen working on it.

The project engineer of Tosco, Eric Hillesland, worked closely with the general foreman of Corey Construction Company, James Kukuchka, in the construction phase of the project. Hillesland visited the work area daily and, in Kukuchka's estimation, would walk the entire length of the steamline in the course of a week. In his inspections, Hillesland examined scaffolding as well as work in progress. As Corey Construction Company neared completion of its work, Hillesland walked with Kukuchka along the entire length of the line to determine what scaffolding should remain in place for the remaining insulation work.

Hillesland had authority to give work orders and to stop work because of safety hazards, such as improper scaffolding. In addition, all welding work required a "hot permit" from the Tosco Fire and Safety Department. Representatives of this department inspected work for all safety hazards, not only those involved in welding, and could order contractors to remedy any kind of safety hazard.

Both Kukuchka and Hillesland insisted that scaffolding in the project complied entirely with safety standards, but since they did not learn of Johnson's accident until the complaint was filed, they could not testify specifically about conditions at the injury site. In contrast, respondents produced two witnesses who offered testimony tending to prove that the project displayed a pattern of safety violations. Gene Lehfeldt, who had worked on a nearby project, saw a scaffold on the steamline lacking hand-rails and toeboards and reported this discrepancy to a Tosco supervisor. George Chevalier, who was also a "transfer" from Phoenix, Arizona, testified that certain scaffolds lacked handrails, and "probably six or eight" scaffolds had gaps in the platform. Some had as few as one or two boards which were not always wired down to the frame.

On the day of the accident, January 28, 1987, Johnson and another insulator, Ray Potter, worked under a foreman, Dave Teeples, of Plant Insulation Company. The weather had been rainy and the company had resumed use of the steamline, causing exposed piping to heat up to almost 400 degrees Fahrenheit. Teeples took Potter to the work site early in the morning. The principal task involved insulating valves lying near the ground, but one elevated section of piping had a valve and two end caps that were exposed. The only scaffold at the site stood about ten feet from the elevated section and was not fully assembled; it possessed only one of four required cross-braces, held no more than two loose boards, and lacked baseplates, screwjacks, handrails, and toeboard. At trial, Potter indicated that he found the scaffold near a pile of loose scaffold parts, but he displayed uncertainty regarding this detail; his testimony on deposition and portions of his testimony at trial were inconsistent on this point.

Potter recalled that Teeples told him he could use the incomplete scaffold if he needed to. Seeing no alternative, he dragged the scaffold over to the elevated section and tied the boards to the tubing with some wire he found nearby. Standing on an inverted bucket placed on top of the narrow platform, he insulated the exposed valve, but the end caps presented even greater difficulty. Because of the location of pipes on the ground, Potter was unable to position the scaffold close enough to these fittings to do the work without a long reach from the end of the scaffold. He elected not to attempt this operation.

Teeples brought Johnson to the work site later in the morning. According to Johnson, he asked Teeples "about [a] handrail and more boards on the scaffold." Teeples replied that he could work on the scaffold "or else go down the road." Johnson and Potter searched for more boards to place on the scaffold and tried unsuccessfully to move it to a more convenient location.

Eventually, Johnson "decided to go ahead and try it." Reaching above his head and stretching beyond the platform as far as he was able, Johnson succeeded in insulating one end cap but, as he attempted the second, the scaffold tilted back. He grasped the exposed end pipe but it was too hot to hold for more than a moment. When he let go, his foot caught on the scaffold, causing him to fall backward onto the pipes below. He claimed that he put his arms below him in an effort to break his fall. Both arms first hit a pipe; then his upper back "landed down onto the pipe."

Johnson now claims total disability as a result of the fall. A treating physician, Dr. Wayne Broky, testified that he suffered from three categories of neurological injury: (1) cervical strain to neck, resulting in reduced rotation and flexion of the neck, (2) chronic pain in arms and an inability to elevate the arms because of the inhibition of pain, and (3) injury to the ulnar nerve in both arms. The ulnar nerve injury resulted in loss of sensation and sharply reduced muscle strength in both hands. Dr. Broky testified that Johnson is no longer able to use tools appropriately or to lift loads of over 10 pounds. A psychologist, Dr. Skip Heck, reported that he lacked a capacity to be trained for other work as he scored in the borderline retarded range in mental tests. Tosco produced sharply conflicting evidence regarding Johnson's disability. An examining physician found only 5 percent impairment in the use of his left extremity and attributed the problem to repeated occupational stress rather than to the fall. A psychologist, Gary Graham, who conducted a series of aptitude tests with a disguised purpose, claimed that Johnson generally possessed normal intelligence and an above average aptitude in spatial relationships. Dr. Graham also found evidence that he falsified or exaggerated certain complaints.

■ "The general rule is that an employer of an independent contractor is not liable for the negligence of the contractor or its employees but the exceptions to the rule have become so numerous that it has been said that the rule is 'general' only in the sense that it is applied where no good reason is found for departing from it." (*Castro* v. *State of California* (1981) 114 Cal.App.3d 503, 509-510 [170 Cal.Rptr. 734].) The Johnsons here sought to establish Tosco's liability on three theories: (1) knowledge of a dangerous or defective condition on its land, (2) the retention of control over the contractor's work, and (3) the employment of the contractor for work involving a peculiar risk of bodily harm. Tosco concedes that there was sufficient evidence for a finding of liability on the first two theories, but it contends that the trial court erred in instructing the jury on the peculiar risk theory of liability.

In applying the peculiar risk doctrine, California courts have adopted the statement of the rule in sections 413 and 416 of the Restatement Second of

Torts. (*Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 253 [66 Cal.Rptr. 20, 437 P.2d 508]; *Griesel v. Dart Industries, Inc.* (1979) 23 Cal.3d 578, 585 [153 Cal.Rptr. 213, 591 P.2d 503]; *Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 508 [156 Cal.Rptr. 41, 595 P.2d 619].) ■ Section 416, the rule applicable to the present case, provides: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

The concept of peculiar risk is elucidated in comment b to section 413 of the Restatement Second of Torts, which is incorporated by reference in a comment to section 416 of the Restatement Second of Torts and quoted with approval in a number of California cases. (*Griesel v. Dart Industries, Inc.*, *supra*, 23 Cal.3d at 586; *Aceves v. Regal Pale Brewing Co.*, *supra*, 24 Cal.3d at 509; *Caudel v. East Bay Mun. Utility Dist.* (1985) 165 Cal.App.3d 1, 7 [211 Cal.Rptr. 222]; *Stark v. Weeks Real Estate* (1979) 94 Cal.App.3d 965, 969, 971-972 [156 Cal.Rptr. 701].) Comment b states that the peculiar risk doctrine applies to "special risks, peculiar to the work to be done, and arising out of its character, or out of the place where it is to be done, against which a reasonable man would recognize the necessity of taking special precautions. The situation is one in which a risk is created which is not a normal, routine matter of customary human activity, such as driving an automobile, but is rather a special danger to those in the vicinity, arising out of the particular situation created, and calling for special precautions. 'Peculiar' . . . has reference only to a special, recognizable danger arising out of the work itself."

A similar explanation of the concept, cited in several decisions, is found in Prosser, Law of Torts (3d ed. 1964) page 486: "[T]he principle seems to be limited to work in which there is a high degree of risk in relation to the particular surroundings, or some rather specific risk or set of risks to those in the vicinity, recognizable in advance as calling for definite precautions. The emphasis is upon the 'peculiar' character of the risk and the need for special, unusual care." (*Addison v. Susanville Lumber, Inc.* (1975) 47 Cal.App.3d 394, 404 [120 Cal.Rptr. 737]; *Anderson v. Chancellor Western Oil Dev. Corp.* (1975) 53 Cal.App.3d 235, 243 [125 Cal.Rptr. 640]; *West v. Guy F. Atkinson Constr. Co.* (1967) 251 Cal.App.2d 296, 299 [59 Cal.Rptr. 286].)

A peculiar risk "is something other than the ordinary and customary dangers which may arise in the course of the work or of normal human activity." (*Griesel v. Dart Industries, Inc.*, *supra*, 23 Cal.3d 578, 586.) "The

possibility of routine negligence in the performance of the work provides no basis for such liability." (*Hughes* v. *Atlantic Pacific Construction Co.* (1987) 194 Cal.App.3d 987, 1000 [240 Cal.Rptr. 200].) As stated in comment b to the Restatement Second of Torts section 413, "[i]t is obvious that an employer of an independent contractor may always anticipate that if the contractor is in any way negligent toward third persons, some harm to such persons may result. . . . [The doctrine] has no reference to such a general anticipation of the possibility that the contractor may in some way be negligent. It is not concerned with the taking of routine precautions, of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work." (See *Stark* v. *Weeks Real Estate, supra*, 94 Cal.App.3d 965, 971.)

■ A contractor's use of defective equipment, which its employer had no part in selecting, does not bring his conduct within the peculiar risk doctrine. (*Hughes* v. *Atlantic Pacific Construction Co., supra*, 194 Cal.App.3d 987, 1001.) Thus, in *Holman* v. *State of California* (1975) 53 Cal.App.3d 317, 327 [124 Cal.Rptr. 773], a worker engaged in a highway construction project was injured when he fell into the negligently exposed driveshaft of an earth-moving machine. The evidence revealed no special danger arising from the condition of the terrain or the nature of the earth-moving operations. The court held that, since his "injuries were caused solely by a defect in [the defendant's] equipment unrelated to any risk inherent in grading and surfacing the highway, as a matter of law vicarious liability under [Restatement Second Torts] section 416 does not arise." (*Id.* at p. 331.)

Again, the contractor's misuse of equipment, whether or not it is defective, lies clearly outside the theory of liability. In *Stark* v. *Weeks Real Estate, supra*, 94 Cal.App.3d 965, the employee of a building contractor deliberately jammed the spring-operated blade guard of a hand-held circular saw, and was seriously injured by the unguarded blade. The court held that property owner who employed the contractor could not be held liable under the peculiar risk doctrine: "We have found no case wherein the peculiar or special risk doctrine has been extended to injuries caused by the negligent use or misuse of hand tools by the independent contractor or its employees, and we do not believe that the risk involved from that type of activity is the type of risk intended to be covered by the doctrine. . . . [T]he peculiar or special risk of harm must be inherent in the work itself and arise out of its character." (*Id.* at p. 972.)

■ Applying these principles, we see no reasonable basis for finding that the contractor's use of a single-stage scaffold entailed a peculiar risk of

harm imposing vicarious liability on Tosco. The scaffold was of a standard type, commonly used in the construction industry; it cannot be reasonably inferred that work on the first stage of the scaffold, only about six feet above ground, involved a high risk of harm. It is true that the scaffold needed to be properly fitted and installed. But the required baseplates, screwjacks, planks, and handrails were ordinary elements of the scaffold rather than special precautions directed against unusual hazards, and the installation of the scaffolding by specially trained personnel was a routine precaution found in most phases of construction work.

Several cases have regarded the erection of proper scaffolding as a needed precaution in peculiarly risky operations. (*Fonseca* v. *County of Orange* (1972) 28 Cal.App.3d 361 [104 Cal.Rptr. 566]; *Stilson* v. *Moulton-Niguel Water Dist.* (1971) 21 Cal.App.3d 928 [98 Cal.Rptr. 914]; *Morehouse* v. *Taubman Co.* (1970) 5 Cal.App.3d 548 [85 Cal.Rptr. 308].) But these decisions obviously cannot be cited for the proposition that work on a scaffolding necessarily involves a peculiar risk. Indeed, the limited authority in point is to the contrary. (*Addison* v. *Susanvill Lumber, Inc.*, supra, 47 Cal.App.3d 394, 404 (dicta); cf. *Hard* v. *Hollywood Turf Club* (1952) 112 Cal.App.2d 263 [246 P.2d 716].) The only decision holding use of a scaffolding to involve a peculiar risk of harm involved a "jerry-rigged" contraption. In *Mackey* v. *Campbell Construction Co.* (1980) 101 Cal.App.3d 774 [162 Cal.Rptr. 64], the owner sanctioned the contractor's use of a top-heavy, 30-foot scaffolding, mounted on a "farm wagon". The decision has no application to use of a standard, single stage scaffolding in the present case.

The injury here resulted from the provision of a defective piece of equipment—the partially assembled (or disassembled) scaffold—and the negligent use of the equipment by reaching from an unstable perch to a barely accessible pipe fitting. Both of these elements of negligence lay outside the peculiar risk doctrine. Seeking to avoid this conclusion, respondents advance two arguments. First, they argue in various ways that Tosco knew or should have known of the dangerous condition at the work site and therefore should have taken precautions. These arguments, however, go to the other two theories of liability—the landowner's responsibility and the owner's retention of control over the operation. The peculiar risk doctrine is not a duplicative theory of liability that can be subsumed within these other theories but a distinct basis of liability.

Secondly, respondents argue that a peculiar risk was created by the "totality of the circumstances" at the job site, i.e., the lack of safety devices, the rainy weather, and hot pipes. To the extent that this argument concerns lack of safety devices, it again serves to support an alternative theory of

liability. But viewed in the abstract, the weather and the hot pipes might indeed present a peculiar risk. The argument fails because of the lack of supporting evidence in the record. Respondents have raised this argument for the first time in this appeal. At trial, they made little effort to prove that the rainy weather and the hot pipes gave rise to a peculiar risk. Johnson was never asked about problems created by rainy weather or muddy ground. Similarly, respondents made no effort to prove that the presence of hot exposed pipes at the work site created a risk of bodily harm. The record reveals that Johnson wore gloves and usually insulated limited areas of exposed fittings on pipes that were elsewhere covered with insulation. Johnson did testify that he burned his hands in another portion of the work but denied that he injured his hands while gripping the pipes to break his fall.

 Respondents argue that Tosco cannot claim to have been prejudiced by the instruction on this alternative theory of liability. Although respondent's counsel emphasized the theory in arguments to the jury, the special verdict presented the jury with a single question: "Was the defendant Tosco Corporation negligent?" Since there was ample evidence for a finding of Tosco's liability on the other negligence theories, respondents argue that the court cannot infer that the verdict would have been different in the absence of this unnecessary and erroneous instruction. (See *Seaman's Direct Buying Service Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 771 [206 Cal.Rptr. 354, 686 P.2d 1158].) The issue of prejudice indeed presents a close question that can best be considered after analysis of other assignments of error in this appeal.

██ ▬ █ █ Tosco next assigns error to the trial court's refusal to give three instructions stressing aspects of the peculiar risk doctrine favorable to the defense.[1] Each instruction was a correct statement of law but served to elucidate or apply aspects of the peculiar risk doctrine rather than to state the general principles. The trial court ruled that two of the instructions were duplicative and the third was addressed to a distinguishable factual situation.[2] We see no error in these rulings. As stated in *Chandler* v. *Benafel* (1934) 3 Cal.App.2d 368, 371 [39 P.2d 890], the court properly

---

[1]Tosco also assigns error to the refusal to give a fourth instruction that would in effect have directed a verdict for the defense on the peculiar risk issue: "The use of a scaffold does not constitute an inherently dangerous or peculiar activity." On any analysis, this instruction was inappropriate. If a peculiar risk instruction was proper, the court should not retract the instruction in this manner. If the instruction was not proper, it should not be given in the first place.

[2]Special Instruction No. 39 was taken verbatim from *Anderson* v. *Chancellor Western Oil Dev. Co., supra,* 53 Cal.App.3d 235, 241: "An owner of land or a general contractor is not liable for injuries resulting from defective equipment used by an independent contractor

"selected those [instructions] which would give the jury a well balanced statement of the essential legal principles which were to guide them in their deliberations. It is not the rule that merely because an instruction may be said to be applicable to the case from the viewpoint of the party offering it, that the court by reason thereof is required to give it."

In a further assignment of error, Tosco maintains that the trial court erred in giving the comparative negligence instruction of BAJI No. 3.40 which imposes a lesser standard of caution on workmen required to work in dangerous situations. The instruction states: "When a person's lawful employment requires that he work in a dangerous location or a place that involves unusual possibilities of injury, or requires that in the line of his duty he take risks which ordinarily a reasonably prudent person would avoid, the necessities of such a situation, insofar as they limit the caution that he can take for his own safety, lessen the amount of caution required of him by law in the exercise of ordinary care."

As suggested by the previous analysis of the peculiar risk doctrine, we do not consider that a single stage scaffold can generally be regarded as "a dangerous location or a place that involves unusual possibilities of injury. . . ." Respondents rely, however, on Johnson's testimony that a supervisor of Plant Insulation Company, David Teeples, impliedly threatened him with discharge if he did not use the partially assembled scaffold. If this testimony is believed, the jury could reasonably find that Johnson was required to do work involving "unusual possibilities of injury."

The facts are very close to those of the leading case, *Austin* v. *Riverside Portland Cement Co.* (1955) 44 Cal.2d 225 [282 P.2d 69]. The plaintiffs there were employed by an independent contractor repairing a rock crusher in the defendant's cement plant. At one point, the work demanded the use of a crane at night in an area with exposed electrical wires. Before undertaking

---

unless that equipment was supplied, selected or controlled by him." The court ruled that it duplicated Amended Special Instruction No. 5.

Special Instruction No. 7A adapts language in *Stark* v. *Weeks Real Estate, supra,* 94 Cal.App.3d 965, 973, to the present case: "An owner of property on which a construction project takes place is not required by law to set up a system to monitor the manner in which component parts of equipment are selected, assembled and used by workmen, and to guard against misuse or negligent use of such items in day to day operations on the job." The court ruled that the *Stark* case, which involved the use of hand tools, was distinguishable.

Instruction No. 8A was drawn from *Holman* v. *State of California, supra,* 53 Cal.App.3d 317, 330: "An owner of property is not liable for injuries from defective equipment or improperly constructed equipment used by a contractor unless the owner supplied the equipment or had the privilege of selecting it or the materials out of which it was made, or unless he exercised active control over the operation of the equipment." The court ruled that it duplicated BAJI Nos. 13.21 and 13.21.4.

this operation, the independent contractor asked the defendant to shut down the electrical power. When the defendant refused, the contractor directed the plaintiffs to proceed with the work in the face of the obvious danger. The crane touched a wire, severely injuring them. Approving the use of BAJI No. 3.40, the Supreme Court noted that the instruction originated in cases involving work in "public streets where there are moving vehicles." These cases recognize that " 'where a person must work in a position of possible danger the amount of care which he is bound to exercise for his own safety may well be less by reason of the necessity of his giving attention to his work than would otherwise be the case.' " (44 Cal.2d at p. 239.) The court saw "no reason why the rule should be different whether the danger is stationary or moving."

Like the *Austin* case, the danger that Johnson faced was not inherent in the nature of the work but was rather created by his supervisor's negligent instruction to employ an unsafe method of doing a particular job. In an attempt to distinguish the *Austin* decision, Tosco points out that the owner there shared responsibility for giving the negligent instruction. Here, Tosco had nothing to do with Teeples's instruction and no reason to anticipate that the contractor would put its employees in such a dangerous predicament. But we consider that it is consistent with the principle of fault underlying our system of tort liability to judge Johnson's conduct by what he actually was instructed to do in his employment. The question whether the owner shared responsibility for negligent instructions placing him in a dangerous situation may be relevant to the owner's liability but it is irrelevant to assessing Johnson's own degree of negligence.[3]

In a final challenge to the jury instructions, Tosco attacks the instruction on a central issue in the case—its duty toward workmen of an independent contractor arising from control of the work or the premises. Tosco requested an instruction pursuant to BAJI No. 8.30 concerning a landowner's duty based on control of the premises where the contractor's work is performed. Respondents requested BAJI No. 8.32 dealing with the duty of a general contractor to employees of a subcontractor. The court ultimately delivered Special Instruction No. 5 drawn largely from BAJI No. 8.32 and *Conner* v. *Utah Constr. & Mining Co.* (1964) 231 Cal.App.2d 263 [41 Cal.Rptr. 728].

---

[3]We see no error in the court's refusal to give Special Instruction No. 40 which was plainly duplicative of BAJI Nos. 13.21 and 13.21.4: "The principal [*sic*] of inherently dangerous activities—unreasonable risk of physical harm—need for special precautions is limited to work in which there is a high degree of risk in relation to the particular surroundings, or some rather specific risk or set of risks to those in the vicinity, recognizable in advance as calling for definite precautions. The emphasis is upon the peculiar character of the risk, and the need for special, unusual care."

The challenged instruction states: "An owner or general contractor exercising supervision over a project owes a duty to the employees of independent contractors to exercise ordinary care and to furnish them with a reasonably safe place in which to work. It is also the duty of an owner or general contractor to warn such employees of any danger which is not obvious and which is known to the owner or general contractor or discoverable by him in the exercise of ordinary care. An owner or general contractor who has reserved control over any part of the work may be liable for negligently failing to exercise such control or supervision."

We will consider separately the three sentences in this instruction, beginning with the last sentence. This sentence, taken directly from *Kramer v. Cedu Foundation, Inc.* (1979) 93 Cal.App.3d 1, 12 [155 Cal.Rptr. 552], states in an extremely condensed manner the principle of Restatement Second of Torts section 414. In *Austin v. Riverside Portland Cement Co.*, *supra*, 44 Cal.2d 225, 232, the Supreme Court expressly approved section 414 and an excerpt from comment a to the section: " 'One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care. . . . [Com. a.] The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.' " (44 Cal.2d at pp. 232-233.)

The *Austin* decision proceeds to link this principle of liability to the duties of a person in possession of land toward invitees: "Generally, the owner of property '. . . is under a duty to keep in safe condition all portions of premises over which he has control' [citation] and in more detail: 'A possessor of land who knows, or reasonably should know, of a . . . condition upon his premises which, he should foresee, exposes his business visitors to an unreasonable risk, and who has no basis for believing that they will discover the condition . . . is under a duty to exercise ordinary care either to make the condition reasonably safe for their use or to give a warning adequate to enable them to avoid the harm.' " (44 Cal.2d at p. 233.)

Later decisions have reiterated the principles of Restatement Second of Torts section 414, as quoted in the *Austin* decision. (*Van Arsdale v. Hollinger*,

*supra*, 68 Cal.2d 245, 254 [66 Cal.Rptr. 20, 437 P.2d 508]; *Kingery* v. *Southern Calif. Edison Co.* (1961) 190 Cal.App.2d 625, 632 [12 Cal.Rptr. 173]; *Abrons* v. *Richfield Oil Corp.* (1961) 190 Cal.App.2d 640, 644 [12 Cal.Rptr. 271].) Other decisions have applied the closely related duties of a possessor of land to the duties of a contractor to employees of a subcontractor, adopting the theory that the subcontractor's employees are invitees of the contractor. (*Pauly* v. *King* (1955) 44 Cal.2d 649, 653 [284 P.2d 487]; *Florez* v. *Groom Development Co.* (1959) 53 Cal.2d 347, 357 [1 Cal.Rptr. 840, 348 P.2d 200]; *Knight* v. *Contracting Engineers Co.* (1961) 194 Cal.App.2d 435 [15 Cal.Rptr. 194].) In this context, several decisions state that the contractor has a duty toward the subcontractor's employees "to keep the premises in a reasonably safe condition . . . ." (*Revels* v. *Southern Cal. Edison Co.* (1952) 113 Cal.App.2d 673, 677 [248 P.2d 986]; *Gonzales* v. *Robert Hiller Const. Co.* (1960) 179 Cal.App.2d 522 [3 Cal.Rptr. 832]; *Gettemy* v. *Star House Movers* (1964) 225 Cal.App.2d 636, 645 [37 Cal.Rptr. 441].)

The first sentence in the instruction is drawn from one of these decisions involving a suit by a subcontractor's employee against a contractor. (*Conner* v. *Utah Constr. & Mining Co.*, *supra*, 231 Cal.App.2d 263.) Acknowledging the origin of the language in precedents dealing with a landowner's duties toward invitees, the court referred jointly to the duties of an owner or general contractor: "An owner or general contractor exercising supervision over a project owes a common law duty to the employees of independent contractors to exercise ordinary care, to furnish them with a reasonably safe place in which to work . . . ." (*Id.* at p. 270.)

The language is sanctioned by ample judicial precedent applying to a contractor's duty toward employees of a subcontractor, but it has uncertain application, demanding further clarification, with respect to the duty of the employer of an independent contractor toward the contractor's employees. In a particular case, the language may be consistent with the employer's duties toward the contractor's employees arising from retained control over the work, or, on the assumption that the employer possesses the land on which the work is done, with the duties of a landowner toward invitees. But removed from a proper context, the broad and unqualified language referring to "an owner . . . exercising supervision over a project" conflicts with decisions limiting the liability of the employer of an independent contractor.

A line of authority stemming from *McDonald* v. *Shell Oil Co.* (1955) 44 Cal.2d 785 [285 P.2d 902], holds that the employer of an independent contractor may exercise various forms of supervision over the contractor's work without incurring a duty to assure the safety of the contractor's employees. (*Woolen* v. *Aerojet General Corp.* (1962) 57 Cal.2d 407, 413 [20

Cal.Rptr. 12, 369 P.2d 708]; *Stilson* v. *Moulton-Niguel Water Dist.*, *supra*, 21 Cal.App.3d 928, 936; *West* v. *Guy F. Atkinson Constr. Co.*, *supra*, 251 Cal.App.2d 296, 299; *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co.* (1962) 202 Cal.App.2d 99, 109 [20 Cal.Rptr. 820].) The *McDonald* decision states: "The owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the indepdent contract—including the right to inspect [citation], the right to stop the work [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation]—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship." (*McDonald* v. *Shell Oil Co.*, *supra*, 44 Cal.2d at p. 790.)[4]

The middle sentence in the instruction requires less comment. The landowner's obligation to warn invitees of hidden hazards plainly does not apply here. It cannot seriously be argued that a partially assembled and unstable scaffold placed over a hard and uneven surface constitutes a concealed danger. The inclusion of this sentence in the instruction could only serve to confuse the jury.

The question of the prejudicial effect of this potentially misleading instruction again can best be left to the end of our analysis. ■ Tosco argues lastly that, by limiting the testimony of a defense expert, the trial court effectively precluded it from contesting respondent's damage claim for wage loss. Respondents asked their expert economic witness, Dr. Michael N. Wolfe, to calculate the present value of Johnson's wage loss over his lifetime on the assumption that he was qualified to earn only $6.62 per hour as a janitor. Dr. Wolfe set the loss at $677,052. In rebuttal, Tosco produced a vocational rehabilitation expert, Dr. Gary M. Graham, who testified that Johnson could qualify for a range of jobs offering better compensation than the janitorial work assumed by Wolfe. But the court sustained respondents' objection when Tosco asked Dr. Graham to calculate the present value of Johnson's wage loss, using Dr. Wolfe's methods, assuming his qualification for such a better paying job. As a consequence, the only wage loss figure before the jury was Dr. Wolfe's figure of $677,052. In final arguments, respondents argued that their claim for wage loss in this amount was undisputed. The jury verdict reflected an award of damages for wage loss precisely in the amount of $677,052.

[4]We note that the trial court rejected two defense instructions based on the *McDonald* decision, Proposed Instructions Nos. 10A and 11A, that would have served to qualify the overly broad language of Special Instruction No. 5.

Tosco contends that, by limiting Dr. Graham's testimony, the trial court departed from an earlier ruling. Respondents had moved *in limine* to exclude Dr. Graham's testimony. In their opposition to this motion, Tosco explained that they did not wish to contest the methods of Dr. Wolfe but only the respondent's assumption as to Johnson's earning capacity. It represented: "Dr. Graham will testify as to what work plaintiff can perform, what his pay is on a daily, monthly, or annual basis, and those monetary sums can be multiplied through the use of Dr. Wolfe's format to establish a work-life value and a reduction of present value." Tosco argues that this representation must be construed as saying that Dr. Graham would calculate the present value of Johnson's wage loss, using Dr. Wolfe's methods, on alternative assumptions as to earning capacity. When the trial court denied the motion *in limine*, it inferred that the court approved this approach and reasonably dispensed with calling an expert witness on economic issues.

In view of the tentative nature of an *in limine* ruling, we do not consider that an abuse of discretion can be predicated on the inconsistency between the exclusion of the testimony at trial and the earlier ruling apparently allowing it. But we see no reasonable basis for challenging Dr. Graham's qualification to make mathematical computations using Dr. Wolfe's methods. The calculations required no special expertise; and if Dr. Graham were not allowed to make them, Tosco would have no means of bringing the implications of his testimony before the jury. The calculations were sufficiently complex that, as a practical matter, they could not be easily adapted to a jury argument. Moreover, if counsel had attempted to present the calculations to the jury, he would face the objection that arguments of counsel are not evidence. (See *Emery* v. *Southern Cal. Gas Co.* (1946) 72 Cal.App.2d 821, 824 [165 P.2d 695].) By making this unexpected and anomalous ruling at trial, the court effectively deprived Tosco of the opportunity of contesting the amount of respondents' claim of damages for wage loss.

 We have deferred the question of prejudical error to the end of this opinion. Respondents dispute the prejudicial effect of each of the errors we have reviewed—the erroneous instruction on the peculiar risk doctrine, the misleading instruction on retained control, and the restriction on Dr. Graham's testimony. Without attempting to analyze separately these issues of prejudice, we conclude that the cumulative effect of the errors was unquestionably to make it "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error[s]." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is reversed. Costs to appellant.

Stein, J., and Dossee, J., concurred.

Respondents' petition for review by the Supreme Court was denied January 15, 1992. Mosk, J., was of the opinion that the petition should be granted.