Filed 9/12/23  Newton v. Enloe Medical Center CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| PATSY NEWTON et al., | C095324 |
| Plaintiffs and Respondents, | (Super. Ct. No. 20CV01091) |
| v. | |
| ENLOE MEDICAL CENTER, | |
| Defendant and Appellant. | |

Patsy Newton developed a serious pressure ulcer (commonly known as a bed sore) while hospitalized at Enloe Medical Center (Enloe) in Chico.  A jury found Enloe liable for elder neglect and that Newton is entitled to the enhanced remedies provided under the Elder Abuse and Dependent Adult Civil Protection Act (the Act).  (Welf. & Inst. Code, § 15600 et seq.)[1]

Enloe now contends (1) the evidence was insufficient to sustain an elder neglect cause of action because its actions constituted, at most, professional negligence and did

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

not rise to the level of recklessness; (2) because there is insufficient evidence of elder neglect, Newton's husband cannot recover for loss of consortium; (3) the trial court erred in instructing on the definitions of neglect and negligence per se; (4) the trial court abused its discretion in allowing evidence of prior Enloe patient bedsores; (5) the cumulative prejudice of the errors requires reversal; (6) we must reverse the award of attorney's fees and costs; and (7) we must reduce the noneconomic damages awarded to Newton.

While it gives us pause to affirm elder neglect liability imposed on a hospital for an omission in care that appears to have been isolated in time, the record indicates Enloe was on notice of prior instances of bedsores involving other patients and did not take sufficient corrective action to prevent the omission in care that occurred with Newton. Ultimately, it was for the jury to determine whether Enloe committed elder neglect under the Act (i.e., a significant pattern of withholding portions or types of care), and the jury found that it did. Our role as a reviewing court is limited to determining whether sufficient evidence supports the jury's determination, viewing the evidence in the light most favorable to the judgment, as we are required to do. (*Quintero v. Weinkauf* (2022) 77 Cal.App.5th 1, 5.)

We conclude the judgment is supported by sufficient evidence, and Enloe has not established any other reversible error or abuse of discretion. Accordingly, we will affirm the judgment.

BACKGROUND

A patient should be turned and repositioned a minimum of every two hours. The failure to adequately turn and reposition a patient may result in sustained pressure on parts of the body and cause a pressure ulcer, which can become life-threatening. All interventions with the patient, including turning and repositioning, should be documented by the staff caring for the patient. Enloe managers understood and taught the importance

2

of turning and repositioning patients, and Enloe management understood that hospital-acquired pressure ulcers were to be reported to the Department of Health.

Pressure ulcers should not happen at an adequately staffed acute care hospital. But Newton offered evidence at trial that there had been prior instances at Enloe in which pressure ulcers formed on patients. In 2019, Enloe reported hospital-acquired pressure injuries to the Department of Health. Problems with Enloe's skin integrity management policy had led to the development of a pressure ulcer in an elderly patient. Enloe did not follow its own policies regarding notice to the patient and the patient's family regarding hospital-acquired pressure ulcers. Another patient subsequently developed three hospital-acquired pressure ulcers but Enloe did not inform the patient or a family member. A third patient also developed a pressure ulcer at the hospital but there was no documentation that the condition was reported to the patient or the family. The nurse manager on the floor where Newton awaited surgery at Enloe was aware of the problems at Enloe with hospital-acquired pressure ulcers and the failure to notify patients and family members about them.

Newton was 81 years old and overweight during the relevant time period. On September 11, 2019, she fell and broke her hip. An ambulance brought her to Enloe's emergency department. She was a high risk for pressure ulcers because of her age, physical condition, and hip injury.

Newton lay mostly on her back in the emergency department for three hours. Early the next morning, she was transferred to the medical surgical unit to await surgery where the nurse found no skin breakdown in the sacral area and noted in the electronic medical record that she needed to be turned and repositioned every two hours. Newton met the criteria for application of foam padding to her sacral area to prevent skin breakdown because she was in traction, had a high body-mass index score, was older than 70, and was on bed rest. Enloe's policy required documentation of each time a patient was turned and repositioned, and the staff knew Newton needed to be turned and

3

repositioned every two hours; however, she was not turned and repositioned in the two days leading up to her surgery and no protective foam was used in the sacral area.[2] State regulations require the caregiver to prepare an individualized care plan, but the computer-generated template used for Newton's care plan did not indicate that Newton had to be turned and repositioned every two hours and needed protective padding.

Newton had surgery on September 13, 2019. The nurse who prepared Newton for surgery could not pad the sacral area because it would have interfered with the surgery. But Newton was placed on a pad for the surgery. The hip surgery lasted five hours, during which Newton could not be turned or repositioned to take pressure off the sacrum. The surgeon was concerned about pressure injuries because of the length of the surgery.

On September 16, 2019, an occupational therapist and a nurse noticed that Newton had a large bruise in her sacral area, indicating the beginning of a pressure ulcer. Newton and her family were told at the time that the bruising was from her fall. But a nurse documented a care plan for the bruise and Newton was turned and repositioned multiple times after it was discovered.

On September 19, 2019, Newton and her family were told for the first time that Newton had a pressure injury and that it was going to get much worse. A doctor said Newton would need additional care because of the severity of the pressure injury wound. The night before she left the hospital, Newton was in pain and wanted to be turned, but

---

[2] There was testimony that Enloe staff may have turned and repositioned Newton prior to the surgery without documenting it, or may have documented it only on the whiteboard in Newton's room. There appears to have been one note in the two days of charting stating "turn," possibly meaning that Newton was turned and repositioned once in the two days before surgery. However, because Newton developed a pressure ulcer, Enloe policy required staff to document in Newton's record every time she was turned and repositioned, and Newton's daughter testified she never observed Newton being turned and repositioned while the daughter was with Newton from early in the morning to late in the evening, the jury could reasonably infer that Enloe staff did not turn and reposition Newton in the two days before the surgery or perhaps did so only once.

she could not find a call button. It had been a long time since they turned her. She eventually notified her daughter of her situation. Her daughter called the nurses' station, and a nurse told her the lift team was too busy to turn Newton. Eventually, the nurses helped Newton.

Newton was discharged to a skilled nursing facility on September 21, 2019. On October 8, 2019, a doctor determined that the pressure ulcer was infected and that Newton needed to be readmitted for further care. She had surgery to debride the infected wound, taking out the dead tissue. She returned to the skilled nursing facility a few days later and went home to convalesce within a few weeks, where her daughter and 84-year-old husband turned and repositioned her every two hours until December 2019. At the time of trial, in September 2022, the wound continued to cause pain and continued to have a discharge.

There was evidence that during the time Newton was under Enloe's care, staff responsible for turning and repositioning her felt overwhelmed and believed they were understaffed. Staff concerns were reported to management multiple times. According to the evidence, staff did not have sufficient time to turn and reposition patients, and not enough nurses were assigned to assess patient wounds and start wound care plans.

Enloe reported Newton's pressure ulcer to the Department of Public Health. After an investigation, the department did not identify any concerns or deficiencies.

Newton's doctor expert testified this was one of the worst cases he had ever seen of a pressure ulcer sustained in an acute care hospital. Prior to the surgery there was no documentation of turning and repositioning despite Newton's high risk of pressure injury due to her medical condition and obesity, leading the expert to believe the pressure injury occurred during that time. Newton's nurse practitioner expert testified Newton's medical records reflected large gaps in time between when she was turned and repositioned, causing sustained, unrelieved pressure on Newton's sacral area. The nurse practitioner

5

expert stated Newton's pressure ulcer was caused by the failure to adequately turn and reposition Newton in the two days leading up to her hip surgery.

Newton filed an action against Enloe for elder neglect under the Act. She did not allege professional malpractice. Newton's husband, Harold Newton, joined as a plaintiff, alleging loss of consortium. In addition, Newton's daughter, Suzanne Bolen, also joined as a plaintiff, alleging negligent infliction of emotional distress.

A jury found Enloe liable for elder neglect but rejected Newton's claim for punitive damages, awarding Newton $225,000 for past pain and suffering, $225,000 for future pain and suffering, $121,733.97 for past medical expenses, and $75,100 for future medical expenses, for a total award of $646,833.97. The jury awarded Harold Newton $50,000 for loss of consortium. But the jury found in favor of Enloe on Bolen's claim for negligent infliction of emotional distress. The trial court awarded Newton $955,500 in attorney's fees and $83,846.52 in costs.

DISCUSSION

I

Enloe contends the evidence was insufficient to sustain an elder neglect cause of action because its actions constituted, at most, professional negligence, and did not rise to the level of recklessness.

A

The Act protects elders from abuse and neglect. Section 15657 provides enhanced remedies when a plaintiff proves "by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63 or neglect as defined in Section 15610.57" and demonstrates that the defendant acted with "recklessness, oppression, fraud, or malice in the commission of this abuse . . . ." (§ 15657.)

Neglect is "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1).) Neglect includes such omissions as

6

failing to assist in personal hygiene, provide medical care, and protect from health and safety hazards. (§ 15610.57, subd. (b).) However, the Act does not apply to "any cause of action for injury or damage against a health care provider . . . based on the health care provider's alleged professional negligence . . . ." (§ 15657.2.) Newton did not include a cause of action for professional negligence in her complaint.

As relevant here, because professional negligence is not actionable under the Act, Enloe could not commit actionable neglect unless its actions were reckless.[3] (*Covenant Care, supra*, 32 Cal.4th at p. 783; *Delaney v. Baker* (1999) 20 Cal.4th 23, 35 (*Delaney*).) If neglect is reckless, it falls within the scope of section 15657 and is not simply professional negligence under section 15657.2. (*Delaney,* at p. 35.)

In *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81 (*Sababin*), a dependent adult woman with a condition heightening the risk of skin deterioration developed a sacral skin ulcer while in the care of a rehabilitation center. After she died, her successors filed an action alleging elder neglect. The trial court granted summary judgment in favor of the rehabilitation center, finding that the rehabilitation center had engaged in professional negligence. (*Sababin,* at pp. 83-84.) On appeal, the rehabilitation center argued it could not be held liable for elder neglect because such liability may be based only on a total absence of care. The Court of Appeal rejected the argument, explaining: "If some care is provided, that will not necessarily absolve a care facility of dependent abuse liability. For example, if a care facility knows it must provide a certain type of care on a daily basis but provides that care sporadically, or is supposed to provide multiple types of care but only provides some of those types of care,

---

[3] Neglect may also refer to acts done with oppression, fraud, or malice. (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 783(*Covenant Care*).) Because the jury rejected Newton's claim for punitive damages, her counsel agreed there is no finding in this case that Enloe acted with oppression, fraud, or malice.

7

withholding of care has occurred. In those cases, the trier of fact must determine whether there is a significant pattern of withholding portions or types of care. A significant pattern is one that involves repeated withholding of care and leads to the conclusion that the pattern was the result of choice or deliberate indifference." (*Id*. at p. 90.)

Enloe claims Newton was not neglected under the Act because she received extensive nursing care. As stated in *Sababin*, however, it is possible to find neglect under the Act even when only some essential care is omitted or sporadically provided, so long as there is a significant pattern of withholding portions or types of care. (*Sababin, supra*, 144 Cal.App.4th at p. 90.) Here, the evidence supports a conclusion that Enloe did not turn and reposition Newton and failed to use protective padding in the two days before Newton's surgery, even though Newton was at high risk for pressure injuries and required turning and repositioning every two hours. And there is evidence that Enloe was on notice of prior instances of patient bedsores at the hospital but did not take sufficient corrective action to prevent Newton's injury.

Enloe nevertheless claims Newton did not present clear and convincing evidence of recklessness.

" 'Recklessness' " means the deliberate disregard of a high degree of probability that an injury will occur. (*Delaney, supra*, 20 Cal.4th at p. 31.) It rises to the level of a conscious choice when there is knowledge of the serious danger to another. (*Id*., at pp. 31-32; *Samantha B. v. Aurora Vista Del Mar, LLC* (2022) 77 Cal.App.5th 85, 99 (*Samantha B.*).)

The evidence supports a jury finding that, despite Newton's high risk for pressure injuries because of her age, medical condition, and injury, she was not turned and repositioned and no protective padding was used in the two days before her surgery. There is also evidence that Enloe was on notice of prior instances of patient bedsores at the hospital but did not take sufficient corrective action to prevent Newton's injury.

8

Enloe argues there is no evidence any such omission of care rose to the level of callous indifference, noting that even grossly negligent conduct is insufficient to prove recklessness. But viewed in the light most favorable to the jury findings and the judgment, the evidence supports reasonable jury inferences that the omission of care occurred because Enloe made conscious decisions regarding staffing levels despite reports of concerns, resulting in inadequate resources for patient repositioning, assessment, and wound care.[4] (See *Fenimore v. Regents of University of California* (2016) 245 Cal.App.4th 1339, 1349 [a hospital's understaffing may support finding of neglect].) Enloe omitted repositioning service to Newton despite knowledge of the high degree of probability that a pressure injury would occur without such care. The evidence supports a finding that Enloe acted with recklessness.[5]

Enloe's contention that the evidence was insufficient to sustain the jury's verdict of liability under the Act is without merit.

---

[4] There is also evidence that the Enloe nurse-to-patient ratio complied with state regulations and that the Department of Public Health did not identify any deficiencies. It was for the jury to weigh the evidence, however, and evidence favorable to Enloe does not render the jury determinations unreasonable.

[5] Although not included in a separate heading, Enloe suggests the recklessness of its employees cannot be attributed to Enloe because management did not commit, authorize, or ratify the reckless acts. (§ 15657, subd. (c); Civ. Code, § 3294.) To be responsible for reckless acts of employees constituting elder neglect, the employer must have, as pertinent to this case, authorized or ratified the wrongful conduct. (§ 15657, subd. (c); Civ. Code, § 3294, subd. (b).) Here, the jury found that one or more of Enloe's managing agents engaged in, authorized, or approved the neglect, or had knowledge of the unfitness of one or more employees who engaged in the neglect and still retained them with conscious disregard of the safety of others. There is also evidence that management knew pressure injuries had occurred at the hospital but did not take sufficient corrective action to prevent Newton's injury. Moreover, to the extent Enloe suggests its employees were at fault, it did not pursue adverse employment action in connection with Newton's injury or provide additional training.

9

## II

Enloe claims that because there is insufficient evidence of elder neglect under the Act, Newton's husband cannot recover for loss of consortium. Having concluded there is sufficient evidence of elder neglect, we need not consider Enloe's contention about loss of consortium.

## III

Enloe next contends the trial court gave prejudicially erroneous instructions on the definitions of neglect and negligence per se.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) We review the instructional issue de novo, considering the evidence in the light most favorable to the appellant. (*Sills v. Los Angeles Transit Lines* (1953) 40 Cal.2d 630, 633.)

If instructional error occurred, we may not reverse the judgment unless it is reasonably probable the appellant would have obtained a more favorable result if the error had not occurred. (*Soule, supra*, 8 Cal.4th at p. 574; see also Cal. Const., art. VI, § 13.) "That assessment, in turn, requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled. [Citation.]" (*Soule,* at p. 574.)

## A

Enloe argues the trial court should not have refused Enloe's proposed instruction on neglect. The trial court instructed the jury on neglect under the Act using the relevant CACI instructions. One of the instructions required the jury to decide whether "Enloe Medical Center failed to use the degree of care that a reasonable person in the same situation would have used in providing for Patsy Newton's basic needs, including

10

providing nursing care for physical and mental health needs, protecting Patsy Newton from health and safety hazards." (CACI 3103.) The trial court also instructed that the jury must decide whether an Enloe employee acted with recklessness, oppression, fraud, or malice in neglecting Newton (CACI 3104) and that recklessness meant the employee "knew it was highly probable that [the employee's] conduct would cause harm [and] he or she knowingly disregarded this risk (CACI No. 3113). Finally, the trial court instructed: "Recklessness is more than just a failure to use reasonable care." (CACI No. 3113.)

Enloe proposed the following additional special instruction: "Neglect refers not to the substandard performance of medical services but, rather, to the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations. Thus, neglect speaks not of the undertaking of medical services, but of the failure to provide medical care." The trial court refused to give this special instruction.

The trial court did not commit instructional error. The instructions given properly informed the jury that neglect required recklessness and properly defined recklessness. The given instructions properly informed the jury of the elements of an elder neglect cause of action under the Act. (*Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 521.) Although Enloe's proposed instruction was consistent with its position that Newton was not neglected because she received extensive nursing care, we have explained that it is possible to find neglect under the Act even when only some essential care is omitted or sporadically provided, so long as there is a significant pattern of withholding portions or types of care. (*Sababin, supra*, 144 Cal.App.4th at p. 90.)

B

Over Enloe's objection, the trial court instructed the jury that violation of various regulations was negligence per se. Enloe now contends the trial court erred in giving Newton's proposed instruction on negligence per se.

11

The trial court instructed the jury concerning provisions of title 22 of the California Code of Regulations dealing with patient care. The provisions required, among other things, adequate staffing, written policies for patient care, patient assessments, patient interventions, communication with patients and their families, and documenting of patient assessment and care. (Cal. Code Regs., tit. 22, §§ 2725, 70211, 70213, 70215.) After instructing on these provisions, the trial court informed the jury that, if Enloe violated the law and the violation was a substantial factor in bringing about harm, then Enloe was negligent.

The doctrine of negligence per se applies to elder neglect actions under the Act. (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1248 (*Norman*).) Enloe does not contest this authority; instead, it claims the instruction on negligence per se should not have been given because there was no evidence that any Enloe regulatory violation was a substantial factor in Newton's injury.

The argument fails because the jury could reasonably infer that Enloe's regulatory failings contributed to Newton's injury, even if the immediate cause of Newton's injury was the failure to turn and reposition her and to apply protective padding. For example, in *Norman*, the decedent, who had been elderly, fell several times, sustaining injuries, while in the care of the defendant skilled nursing facility. Although the Department of Health Services had determined that the defendant had violated several regulatory provisions concerning assessment and care of patients, the trial court nevertheless denied the plaintiff's request for an instruction on negligence per se. (*Norman, supra*, 107 Cal.App.4th at pp.1236-1238, 1240.) After judgment for the defendant, the Court of Appeal reversed because the jury could have found that the defendant's violation of regulations concerning assessment and care of patients was a substantial factor in the decedent's injuries. The regulations were designed to protect against such injuries. (*Id.* at p. 1248.)

12

The same is true here.  The regulations, such as those pertaining to assessment, care, staffing, and training, were intended to prevent injury.  The jury could have reasonably inferred that Enloe's choices regarding staffing and training were a substantial factor in causing Newton's pressure ulcer.

The jury was further instructed that if regulatory violations were not a substantial factor in Newton's injuries, the doctrine of negligence per se did not apply.  We presume the jury followed the trial court's instruction.  (*Carroll v. Commission on Teacher Credentialing* (2020) 56 Cal.App.5th 365, 383.)

Enloe's instructional challenges lack merit.

IV

In addition, Enloe contends the trial court abused its discretion in allowing evidence of prior Enloe patient bedsores.

We review evidentiary rulings for abuse of discretion.  (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)  We reverse only if it is reasonably probable the appellant would have obtained a more favorable result if the trial court had not abused its discretion.  (*Ibid.*)

As detailed above, the trial court admitted, over Enloe's objection, evidence of prior instances of pressure injuries at Enloe.  The evidence referenced the prior pressure injuries, problems with Enloe's skin integrity management policy, failure to provide notice to patients and their families about pressure injuries, and failure to document notice to the patients and their families.  The trial court determined these instances were both relevant and admissible under Evidence Code section 352.

Among other things, the evidence of prior instances of bedsores was relevant to whether there was a significant pattern of withholding portions or types of care (*Sababin, supra*, 144 Cal.App.4th at p. 90), i.e., whether Enloe acted with recklessness.  Newton introduced the evidence, at least in part, to show Enloe's knowledge or state of mind at the time of Newton's injury.  (Evid. Code, § 1101, subd. (b); see *Bihun v. AT&T*

13

*Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 988, disapproved on other grounds in *Lakin v. Watkins Associated Industries* (1993) 6 Cal. 4th 644, 664.)  The evidence of prior instances tended to show that Enloe had notice of patient pressure injuries but did not take sufficient corrective action to protect Newton from such injury.  The evidence of prior instances was relevant and admissible.

Enloe argues the evidence of prior injuries allowed the jury to punish Enloe for more than just this case.  (See *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 930 [due process concern when dissimilar conduct used as basis for punitive damages].)  But the argument lacks merit because the prior instances were not dissimilar.

Enloe's challenge to the evidence of prior bedsores is without merit.

V

Moreover, Enloe contends the cumulative prejudice caused by the instructional and evidentiary errors requires reversal.  (*Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 141 [cumulative effect of errors required reversal].)  Having found no instructional or evidentiary error, we need not consider this contention.

VI

Further, Enloe asserts we must reverse the award of attorney's fees and costs along with reversal of the judgment.  Again, having found no reversible error, we need not consider this contention.

VII

Finally, Enloe claims we must reduce the noneconomic damages awarded to Newton from $450,000 to $250,000.  Enloe argues the MICRA[6] limitation of $250,000

---

[6] "MICRA, the Medical Injury Compensation Reform Act of 1975, refers to several statutes that restrict or place conditions upon causes of action and remedies directed at 'health care providers' for 'professional negligence.' " (*Delaney, supra*, 20 Cal.4th at p. 28, fn. 2.)

14

in noneconomic damages applies to actions by living victims of elder abuse, even though *Samantha B.* held to the contrary.

This contention depends on the proper interpretation of section 15657, subdivision (b), a part of the Act, which provides that the limitations on recoverable damages imposed by section 377.34 of the Code of Civil Procedure (pertaining to MICRA actions involving a decedent) shall not apply. Section 15657, subdivision (b) goes on to say, however, that the damages recovered shall not exceed those permitted under Civil Code section 3333.2, subdivision (b) [which, in the former version relevant to this case, limited noneconomic damages to $250,000].

Code of Civil Procedure section 377.34 prohibits recovery of noneconomic damages in MICRA actions brought on behalf of decedents; noneconomic damages cannot be awarded after the victim of the professional malpractice dies. Code of Civil Procedure section 377.34 does not apply to Newton because she is not deceased, and in any event, section 15657, subdivision (b) states that the limitation does not apply to elder neglect actions under the Act.

It is the second sentence of section 15657, subdivision (b) that is at issue here. It provides: "However, the damages recovered shall not exceed the damages permitted to be recovered pursuant to subdivision (b) of Section 3333.2 of the Civil Code." Former Civil Code section 3333.2, subdivision (b) provided: "In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)." (Stats. 1975, 2d Ex. Sess., ch. 1, § 24.6, amended Stats 1975, 2d Ex. Sess., ch. 2, § 1.191, effective December 12, 1975.) In *Samantha B., supra*, 77 Cal.App.5th at pages 103-104, the Court of Appeal determined that the limitation of noneconomic damages to $250,000 applied to an elder abuse action only if the victim of elder abuse is deceased. The court reasoned: "The second sentence of [section 15657, subdivision (b)] begins with 'However.' (§ 15657, subd. (b).) It modifies the first sentence. Thus, the second sentence of the subdivision, limiting noneconomic damages, only applies to the first

15

sentence relating to causes of action brought on behalf of decedents. Because in this action [the victims of elder abuse] are alive, the limitation of noneconomic damages in section 15657, subdivision (b) does not apply." (*Samantha B.,* at p. 104.)

Enloe argues a recent amendment of Civil Code section 3333.2 calls into question *Samantha B.*'s interpretation of section 15657, subdivision (b). Effective January 1, 2023, the Legislature amended Civil Code section 3333.2 by rearranging and modifying parts of the statute. Of particular interest here is that the amendment separated into two different subdivisions the provisions relating to actions that do "not involve wrongful death" in subdivision (b) and actions "for wrongful death" in subdivision (c). Subdivision (b) now provides that, in actions involving a live victim of professional malpractice, noneconomic damages against health care providers and health care institutions shall not exceed $350,000. In subdivision (c), noneconomic damages against health care providers and health care institutions are limited to $500,000 in wrongful death actions, meaning the victim of professional negligence is now deceased. (Stats. 2022, ch. 17, § 3.)

The reference to Civil Code section 3333.2, subdivision (b) in the Act at section 15657, subdivision (b), was not amended. It still provides that the noneconomic damages recovered "shall not exceed the damages permitted to be recovered pursuant to subdivision (b) of Section 3333.2 of the Civil Code." If the holding in *Samantha B.* is applied, section 15657, subdivision (b) would refer only to deceased victims of elder abuse or neglect, even though the amended version of Civil Code section 3333.2, subdivision (b) refers only to living victims of professional negligence. Enloe argues such a disparity between living and deceased victims in the two provisions calls into question the holding in *Samantha B.*

We need not decide whether *Samantha B.* remains viable, because here Enloe has not established that the award of damages was clear error or resulted in a miscarriage of justice. Actions under the Act and actions for professional negligence are different types

of proceedings. Whether or not the Legislature intended such a result, it would not be irrational for the Legislature to adopt the limitation of noneconomic damages ($350,000) applicable to a living victim of professional negligence (Civ. Code, § 3333.2, subd. (b)) as a limitation of noneconomic damages in an elder abuse action in which the victim of elder abuse is deceased (§ 15657, subd. (b)). Under applicable case precedent, which we decline to revisit in this case, because this is not an action involving a deceased victim of elder abuse, the limitation of noneconomic damages in the second sentence of section 115657, subdivision (b), with its reference to Civil Code section 3333.2, subdivision (b), does not apply.

## DISPOSITION

The judgment is affirmed. The plaintiffs are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


        /S/
        MAURO, J.



We concur:


    /S/
HULL, Acting P. J.


    /S/
MESIWALA, J.

17